## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MAINE

| | | |
|---|---|---|
| CITY OF BANGOR, MAINE, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 02-183-B-S |
| | ) | |
| v. | ) | |
| | ) | |
| CITIZENS COMMUNICATIONS | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendant & Third-Party Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BARRETT PAVING MATERIALS, INC., *et al.*, | ) ) | |

Third-Party Defendants.

### CITIZENS COMMUNICATIONS COMPANY'S MOTION FOR
### SUMMARY JUDGMENT AND SUPPORTING MEMORANDUM OF LAW

Pursuant to Federal Rule of Civil Procedure 56 and Local Rules 7 and 56, Defendant Citizens Communications Company ("Citizens") respectfully submits this motion for summary judgment as to all counts of the City of Bangor, Maine (the "City")'s Second Amended Complaint.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................................................iv

INTRODUCTION...................................................................................1

ARGUMENT........................................................................................2

**I.    CITIZENS IS ENTITLED TO JUDGMENT ON COUNTS I AND II BECAUSE THE CITY IS A PRP WHICH CANNOT BRING JOINT LIABILITY CLAIMS UNDER CERCLA.** ...................................2

    A.    The City's Status As An Owner And Operator Of The Facility At Issue Makes It A Potentially Responsible Party. ...........................3

    B.    The City Is A PRP Because It Owns And Operates The Sewer Alleged To Be The Conduit Between The Gas Works And The Penobscot River, And Because It Arranged For Any Disposal Of Hazardous Substances Through That Sewer. ...........................4

    C.    The City Is A PRP Because It Released Hazardous Substances That Contributed To The Contamination Of The River...........................5

**II.   CITIZENS IS ENTITLED TO JUDGMENT ON COUNTS III AND IV BECAUSE CERCLA DOES NOT PERMIT CONTRIBUTION CLAIMS PRIOR TO AN ACTION UNDER §§ 106 OR 107.**....................7

    A.    Section 113(f)(1) Prohibits The City From Pursuing A Contribution Action Prior To The Successful Initiation Of A Civil Action Under §§ 106 Or 107. ...........................7

    B.    If The City's Contribution Action Is Allowed To Proceed, The City Bears The Burden Of Proving Citizens Equitable Share Of Liability, To The Exclusion Of All Third Parties. ...........................9

**III.  CITIZENS IS ENTITLED TO JUDGMENT ON THE CITY'S RCRA CITIZEN-SUIT CLAIMS FOR MONETARY AND INJUNCTIVE RELIEF (COUNT XVII).**...........................11

    A.    The City Cannot Proceed With A Citizen Suit Because The State Of Maine Is Diligently Proceeding With A Remedial Action At The Site..............11

    B.    The City Cannot Recover Past Or Future Money Damages Under RCRA's Citizen-Suit Provision. ...........................14

**IV.   IF THE COURT ENTERS JUDGMENT AGAINST THE CITY'S FEDERAL CLAIMS, IT SHOULD DECLINE TO EXERCISE SUPPLEMENTAL JURISDICTION OVER THE CITY'S STATE LAW CLAIMS.**...........................15

**V.    CITIZENS IS ENTITLED TO JUDGMENT ON ALL OF THE CITY'S PUBLIC NUISANCE CLAIMS (COUNTS V, VI, VII, VIII, X, XI, XIV AND XV).** ...........................16

A.   The Court Should Dismiss All Of The City's Statutory Nuisance Counts Not Based On 17 M.R.S.A. § 2701 (Counts VI, VII, VIII And IX) Because Only § 2701 Creates A Cause Of Action. ............................................ 16

B.   The City Does Not Allege, Nor Has It Suffered, The "Special And Peculiar Damages" Necessary To Bring A Public Nuisance Claim. .................. 18

VI.   CITIZENS IS ENTITLED TO JUDGMENT ON ALL OF THE CITY'S PRIVATE NUISANCE CLAIMS (COUNTS IX, XII, XIV AND XV). ................... 19

A.   The City Cannot Recover In Private Nuisance From A Prior Owner Of Non-Adjacent Property. ...................................................................................... 20

B.   The City Failed To Produce Evidence That Citizens Had The Requisite Intent To Interfere With The Use And Enjoyment Of Land. ............................... 22

C.   The City Has Not Demonstrated A Substantial Interference With The Use Or Enjoyment Of Its Land. ..................................................................................... 24

VII.   CITIZENS IS ENTITLED TO JUDGMENT ON THE CITY'S STRICT LIABILITY FOR ULTRAHAZARDOUS ACTIVITY CLAIM (COUNT XIII). ................................................................................................................................ 24

A.   The Maine Law Court Has Rejected Causes Of Action Based On Strict Liability For Ultrahazardous Activity. .................................................................. 24

B.   Maine's Statute Of Limitations Bars The City's Strict Liability Claims. ............ 28

C.   The City Cannot Recover Based On Strict Liability Because Operating A Manufactured Gas Plant Is Not An Ultrahazardous Or Abnormally Dangerous Activity. ................................................................................................. 29

VIII.   BECAUSE IT CANNOT PROVE THAT THE OPERATORS OF THE GAS WORKS ACTED WITH ACTUAL OR IMPLIED MALICE, THE CITY IS NOT ENTITLED TO RECOVER PUNITIVE DAMAGES (COUNT XVI). .......... 30

IX.   CITIZENS' EQUITABLE DEFENSES BAR THE CITY'S CLAIMS IN THEIR ENTRETY. ..................................................................................................... 32

A.   Because The City Unreasonably And Prejudicially Delayed Filing A Complaint, Laches Bars The Present Action. ....................................................... 32

B.   The Doctrines of Unclean Hands and Equitable Estoppel Bar The City's Claims. ...................................................................................................................... 33

C.   Citizens Cannot Be Enjoined To Perform Cleanup Activities On Property That Neither Citizens Nor The City Owns. ........................................................ 35

CONCLUSION ...................................................................................................................... 35

**Page(s)**

*Acushnet Co.* v. *Mohasco Corp.*, 191 F.3d 69 (1st Cir. 1999)....................................3, 9

*Akzo Coatings, Inc.* v. *Aigner Corp.*, 30 F.3d 761 (7th Cir. 1994)..............................7

*Andritz Sprout-Bauer, Inc.* v. *Beazer East, Inc.*, 174 F.R.D. 609 (M.D. Pa. 1997) ........................................................................................................15

*Brown* v. *Watson*, 47 Me. 161, 162 (1859)........................................................18

*Bruzga* v. *PMR Architects, P.C.*, 693 A.2d 401 (N.H. 1997) ........................................26

*Centerior Serv. Co.* v. *Acme Scrap Iron & Metal Corp.*, 153 F.3d 344 (6th Cir. 1998) ........................................................................................................9

*Charlton* v. *Town of Oxford*, 774 A.2d 366 (Me. 2001) .............................. *passim*

*City of Auburn* v. *Desgrosseilliers*, 578 A.2d 712 (Me. 1990) ....................................34

*Cooper Indus.* v. *Aviall Servs.*, No. 02-1192 .............................................................8

*Deadham Water Co.* v. *Cumberland Farms Dairy, Inc.*, 889 F.2d 1146 (1st Cir. 1989) ........................................................................................................5

*Dugan* v. *Martel*, 588 A.2d 744 (1991) ........................................................................28

*E.I. DuPont de Nemours & Co.* v. *United States*, 297 F. Supp. 2d 740 (D.N.J. 2003)........................................................................................................8

*Express Car Wash Corp.* v. *Irinaga Bros., Inc.*, 967 F. Supp. 1188 (D. Or. 1997) ........................................................................................................15

*Furrer* v. *Brown*, 63 F.3d 1092 (8th Cir. 1995).......................................................11, 15

*G.J. Leasing Co.* v. *Union Elec. Co.*, 54 F.3d 379 (7th Cir. 1995)...............................29

*Hamm* v. *Hamm*, 584 A.2d 59 (Me. 1990) ......................................................................34

*Hanlin Group, Inc.* v. *International Minerals & Chemical Corp.*, 759 F. Supp. 925 (D. Me. 1990) ...................................................................... *passim*

*Iglesias* v. *Mutual Life Ins. Co. of New York*, 156 F.3d 237 (1st Cir. 1998) ................32

*Johnston* v. *Dow & Coulombe, Inc.*, 686 A.2d 1064 (Me. 1996)................................28

*Lamie* v. *United States Trustee*, 124 S. Ct. 1023 (2004) .............................................8

*Lefebvre* v. *Central Maine Power Co.*, 7 F. Supp. 2d 64 (D. Me. 1998)......................................26

*Levesque* v. *Pelletier*, 68 A.2d 9 (Me. 1949) ..............................................................................35

*Maine People's Alliance* v. *Holtrachem Mfg. Co., L.L.C.*, 2001 WL
1602053 (D. Me. Dec, 14, 2001) ..........................................................................................33

*Meghrig* v. *KFC Western, Inc.*, 516 U.S. 479 (1996) .........................................................11, 13, 14

*Murray* v. *Bath Iron Works Corp.*, 867 F. Supp. 33 (D. Me. 1994) ............................................26

*Navarro* v. *Pfizer Corp.*, 261 F.3d 90 (1st Cir. 2001)...................................................................2

*Orange Environment, Inc.* v. *County of Orange*, 860 F. Supp. 1003
(S.D.N.Y. 1994) ......................................................................................................................12

*Organic Chemicals Site PRP Group* v. *Total Petroleum, Inc.*, 6 F. Supp.
2d 660 (W.D. Mich. 1998) ......................................................................................................13

*Philadelphia Elec. Co.* v. *Hercules, Inc.*, 762 F.2d 303 (3d Cir. 1985)...................................20, 21

*Prather* v. *Brandt*, 981 S.W.2d 801 (Tex. App. 1998) ................................................................26

*In re Reading*, 115 F.3d 1111 (3d Cir. 1997)..............................................................................8

*Regional Airport Authority of Louisville & Jefferson County* v. *LFG, LLC*,
255 F. Supp. 2d 688 (W.D. Ky. 2003) ...............................................................................20, 21

*Reynolds* v. *W.H. Hinman Co.*, 75 A.2d 802 (1950).........................................................25, 26, 27

*Roche* v. *John Hancock Mut. Life Ins. Co.*, 81 F.3d 249 (1st Cir. 1996).....................................15

*Rylands* v. *Fletcher*, 3 L.R.-E. & I. App. 330 (H.L. 1868)......................................................25, 26

*Sealy Connecticut, Inc.* v. *Litton Indus., Inc.*, 989 F. Supp. 120 (D. Conn.
1997) ........................................................................................................................................30

*Smedberg* v. *Moxie Dam Co.*, 92 A.2d 606 (Me. 1952) ..............................................................19

*Smith* v. *Heritage Salmon, Inc.*, 180 F. Supp. 2d 208 (D. Me. 2002).........................................27

*Splendorio* v. *Bilray Demolition Co., Inc.*, 682 A.2d 461 (R.I. 1996).........................................30

*Town of Falmouth* v. *Long*, 578 A.2d 1168 (Me. 1990)..............................................................32

*Tuttle* v. *Raymond*, 494 A.2d 1353 (Me. 1985) .....................................................................30, 31

Page(s)

*United States* v. *Davis*, 261 F.3d 1 (1st Cir. 2001) ......................................................................3

*United Technologies Corp.* v. *Browning-Ferris Indus., Inc.*, 33 F.3d 96 (1st Cir. 1994) ............................................................................................................7, 9

*Westfarm Assocs. Ltd.* v. *Washington Suburban Sanitary Comm'n*, 66 F.3d 669 (4th Cir. 1995) ..........................................................................................3, 5

**STATUTES**

14 M.R.S.A. § 752 ......................................................................................................28

17 M.R.S.A. § 2701 ..........................................................................................16, 17, 22

17 M.R.S.A. § 2702 ................................................................................................17, 22

17 M.R.S.A. § 2741 ....................................................................................................17

17 M.R.S.A. §§ 2791-2806 .....................................................................................17, 22

17 M.R.S.A. § 2802 ....................................................................................................17

38 M.R.S.A. § 1364 ....................................................................................................13

28 U.S.C. § 1367 ........................................................................................................15

42 U.S.C. § 6928 ........................................................................................................11

42 U.S.C. § 6972 ..............................................................................................11, 12, 13

42 U.S.C. § 9607 .................................................................................................. *passim*

42 U.S.C. § 9613 ....................................................................................................7, 8

Fed. R. Civ. P. 56 ....................................................................................................2, 5

**MISCELLANEOUS**

42 Am. Jur. 2d § 17 ....................................................................................................35

57A Am. Jur. 2d Negligence § 382 ..............................................................................26

W. Page Keeton *et al.*, Prosser and Keeton on the Law of Torts § 87 (5th ed. 1984) ..........................................................................................................22

W. Prosser, *Law of Torts* § 88 (4th ed. 1971) ................................................................19

# TABLE OF AUTHORITIES
## (Continued)

Page(s)

Restatement of Torts (Third) § 23 cmt. b (2000)..........................................................................7

Restatement (Second) of Torts § 520............................................................................................29

Jed Handelsman Shugerman, *The Floodgates of Strict Liability: Bursting Reservoirs and the Adoption of Fletcher* v. *Rylands in the Gilded Age,* 110 Yale L.J. 333 (2000) ......................................................................................................25, 26

Jeremiah Smith, *Liability for Damage to Land by Blasting*, 33 Harv. L. Rev. 542 (1920) .........................................................................................................................26

# INTRODUCTION

For more than a century between the mid-1800s and the mid-1900s, the Penobscot River was the center of industrial activity in the industrial City of Bangor, Maine. Coal docks, oil terminals, tar tanks, an asphalt plant and a 30-acre railroad switching yard, among other things, were all located on the river bank. Ships carrying coal, oil, tar and asphalt traveled up and down the river, stopping to unload or take on cargo in Bangor's harbor. A large part of Bangor's city sewer system emptied its contents into that same harbor. Predictably, these activities created a substantial pollution problem in the Penobscot River.

The City of Bangor's 106-paragraph, 17-count Second Amended Complaint alleges that part of this pollution problem • a tarry substance located in a portion of the river known as Dunnett's Cove • is entirely the result of discharges from a manufactured gas plant called the Bangor Gas Works. But despite extensive discovery, the City's allegations remain factually and legally insufficient. Indeed, the facts show that the City itself "facilitate[d] the alleged 100-plus years of hazardous waste disposal of which it now complains," and "designated the Penobscot River as the appropriate disposal facility." This Court has accordingly recommended entry of summary judgment in Citizens' favor on a major component of the City's complaint, its joint liability claims under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"). Unless and until it is subjected to joint liability claims by regulatory authorities, the City likewise cannot obtain CERCLA contribution. The City's other federal cause of action, a citizen suit brought pursuant to the Resource Conservation and Recovery Act ("RCRA"), cannot proceed in the face of the state of Maine's diligent attention to the problems in the Penobscot River. The City's state claims are for various reasons similarly inadequate. The Court therefore should grant Citizens' motion for summary judgment as to all of the City's

claims or, in the alternative, grant summary judgment against the City's federal claims and exercise its discretion to dismiss any remaining state claims.

## ARGUMENT

Federal Rule of Civil Procedure 56(c) requires that a summary judgment motion be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  In making this determination, the Court should view the evidence in the light most favorable to the non-moving party.  *Navarro* v. *Pfizer Corp.*, 261 F.3d 90, 94 (1st Cir. 2001).

I.      **CITIZENS IS ENTITLED TO JUDGMENT ON COUNTS I AND II BECAUSE THE CITY IS A PRP WHICH CANNOT BRING JOINT LIABILITY CLAIMS UNDER CERCLA.**

As this Court has already determined, the City is a PRP.  Recommended Decision on Citizens Communications Company's Motion for Partial Summary Judgment and Order on Motion to Deem Facts Admitted ("Rec. Dec.") at 24-25 & n.24.  As such, the City cannot puruse the joint liability claims set forth in Counts I and II of its Second Amended Complaint. *Id*. at 26-27; see *id*. at 9 ("As a matter of law, PRPs are precluded from pursuing a 'full recovery' under § 107(a) and must make do with contribution, or equitable apportionment * * *.").  But because the Court's Recommended Decision granting Citizens' Partial Summary Judgment motion is presently still subject to objections, Citizens will take this opportunity to reiterate briefly its arguments regarding the City's PRP status, and to add additional factual arguments that were not previously available.

**A.    The City's Status As An Owner And Operator Of The Facility At Issue Makes It A Potentially Responsible Party.**

 Under CERCLA, the current "owner and operator of * * * a facility" is a PRP.  42 U.S.C. § 9607(a)(1).  The City has conceded that it is the current owner of property that is a part of the facility in the present case.  See Summ. J. Obj. at 15; Rec. Dec. at 16-17.  "By and large, a person who falls within one of the four categories defined in § 9607(a)" — as the City admits that it does — "is exposed to CERCLA liability."  *Id.* at 74.  CERCLA's affirmative defenses are "difficult to satisfy."  *United States* v. *Davis*, 261 F.3d 1, 29 n.19 (1st Cir. 2001); *Acushnet Co.* v. *Mohasco Corp.*, 191 F.3d 69, 74 (1st Cir. 1999).

This Court has already found that the City's "direct arrangement of and contribution toward hazardous waste disposal * * * effectively prevents the City from seeking relief in the third-party defense, 42 U.S.C. § 9607(b)(3)."  Rec. Dec. at 25-26 (footnote omitted) (citing *Westfarm Assocs. Ltd.* v. *Washington Suburban Sanitary Comm'n*, 66 F.3d 669, 682-83 (4th Cir. 1995)).  In 1852, the City of Bangor conditioned the initial construction of the Bangor Gas Works on the use of a "covered drain * * * to carry off all the residuum of filth of said works" to the Penobscot River.  Citizens Communications Company's Statement of Material Facts in Support of Its Motion for Summary Judgment ("SMF") ¶ 3.  The City undertook to build this drain in 1860.  *Id.* ¶ 4; Rec. Dec. at 3.  Thus, the City of Bangor was not only ***aware*** of discharges to the river, it actually ***sanctioned*** and ***facilitated*** them.

This Court accordingly determined that "the City exercised its powers of eminent domain to effectuate or facilitate the construction in the middle part of the Nineteenth Century of an enclosed sewer drain that was installed specifically for the purpose of carrying away the waste of the private company that owned and operated the former gas plant.  Not only did the City thereby facilitate the alleged 100-plus years of hazardous waste disposal of which it now complains, but

it also designated the Penobscot River as the appropriate disposal facility."  Rec. Dec. at 24-25.

Under CERCLA § 107(b)(3), such century-long complicity in any release of waste to the river

presents an insurmountable obstacle to the City's planned escape from CERCLA liability.[1]  See

*id*. at 25-26.

> **B.** **The City Is A PRP Because It Owns And Operates The Sewer Alleged To Be The Conduit Between The Gas Works And The Penobscot River, And Because It Arranged For Any Disposal Of Hazardous Substances Through That Sewer.**

In addition to its admitted ownership of property that is a part of the facility in this case,

this Court has found that the City qualifies as a PRP based on:  (1) its operation of the portion of

the Bangor municipal sewer system alleged to be the sole link between the Gas Works and the

Penobscot River (see Second Amended Complaint ("Compl.") ¶ 21) and (2) its activities in

arranging for disposal of hazardous substances through the sewer.  Rec. Dec. at 23-26 & n.24.

The full record on this summary judgment motion further establishes that the City is a PRP based

on its ownership of the Davis Brook sewer.

During discovery, the City repeatedly expressed agnosticism on the question of

ownership.  It has not categorically denied ownership, however, nor has it suggested who else

might own this portion of the sewer line.  The City has admitted conducting "about seven"

projects — presumably without trespassing — on the portion of the Davis Brook sewer between

the Gas Works and the Penobscot River.  SMF ¶ 8; Summ. J. Obj. at 10.  Moreover, the City

through its attorney has asserted the ability to restrict access to the Davis Brook sewer and

warned Citizens' consultants against "unauthorized collection of samples from ***City property*** *

*."  Summ. J. Exhibit 15 (emphasis added); SMF ¶ 9.  In light of this definitive evidence, as well

---

[1]    Citizens experts will testify that wastewater released from the Gas Works contained much smaller amounts of hazardous substances, if it any at all, than the City's experts contend.

as the facts surrounding the City's operation of the Davis Brook sewer (see Rec. Dec. at 23-26), the City's persistent refusal to admit ownership does not meet Rule 56(e)'s requirement that a nonmoving party "set forth specific facts showing that there is a genuine issue for trial" (Fed. R. Civ. P. 56(e)). Citizens is accordingly entitled to summary judgment that the City is a PRP based on its ownership of the Davis Brook sewer.

### C. The City Is A PRP Because It Released Hazardous Substances That Contributed To The Contamination Of The River.

Now that discovery in this case is substantially complete (at least as between the plaintiff and defendant), the record demonstrates beyond reasonable dispute that the City's own tar-related actions contributed to the contamination of the Penobscot River. Though the statutory language is rather dense, CERCLA requires only that a party dispose of hazardous substances at a facility containing such hazardous substances to qualify as an arranger PRP. See 42 U.S.C. § 9607(a)(3). Crucially, evidence that hazardous substances which were at one time under the control of the alleged PRP "*could have*" migrated to a location where like contaminants currently exist suffices to prove arranger liability. *Westfarm*, 66 F.3d at 681 (emphasis added); see *Deadham Water Co.* v. *Cumberland Farms Dairy, Inc.*, 889 F.2d 1146, 1154 (1st Cir. 1989) (holding that arranger liability does not require "proof that a defendant's hazardous waste actually have migrated to plaintiff's property * * *"). Once this *prima facie* case for PRP status as an arranger is made out, the burden of disproving causation lies with the party accused of being a PRP. See *Westfarm*, 66 F.3d at 681.

Unchallenged evidence in the record establishes *prima facie* that City activities released hazardous substances like those located in the Penobscot River. First, the City has not come forward with "specific facts" (see Fed. R. Civ. P. 56(e)) disputing the documented existence of City-operated tar tanks located near the Davis Brook sewer outfall. See SMF ¶ 10. Testing

conducted by Citizens experts, which also has not been challenged, showed the presence of tar in the ground at the former location of the City's tanks. See SMF ¶ 11. These results corroborate the Maine Department of Environmental Protection ("DEP")'s 1996 observations of tar in the same vicinity. See SMF ¶ 12. Releases of tar from the City's tanks easily could have traveled to the alleged tar slick in the Penobscot River via surface runoff or storm drains leading into the Davis Brook sewer or directly into the river. See SMF ¶ 13.

Second, documents in the record prove that the City purchased millions of gallons of tar, and that the City used this tar to pave the streets of Bangor from at least 1871 through 1957. See Expert Report of Dr. Andrew C. Middleton ("Middleton Report") at 17 (Summ. J. Exhibit 25); SMF ¶ 14. Numerous of these streets had drains leading to the Davis Brook sewer subsection, which in turn emptied into the Penobscot River. See SMF ¶ 15. Liquid paving tar likely flowed into storm sewers in or near the streets on which it was being applied. SMF ¶ 16. In addition, rainwater runoff from freshly paved streets likely contributed tar to the Davis Brook sewer system. SMF ¶ 17. Tar from the City's paving operations thus could have followed the same route to the alleged tar slick in the Penobscot River that the City claims tar from the Gas Works followed.

The evidence of tar releases from the City's tanks and street paving operations constitute a separate *prima facie* case for arranger liability against the City. As a result, the City has the affirmative burden of proving that no tar from either of these sources ever entered the Penobscot River. Even viewing the City's evidence in its most favorable light, it fails to prove this negative proposition. The City accordingly qualifies as an arranger PRP under CERCLA § 107(a)(3).

II.   **CITIZENS IS ENTITLED TO JUDGMENT ON COUNTS III AND IV BECAUSE CERCLA DOES NOT PERMIT CONTRIBUTION CLAIMS PRIOR TO AN ACTION UNDER §§ 106 OR 107.**

    A.   **Section 113(f)(1) Prohibits The City From Pursuing A Contribution Action Prior To The Successful Initiation Of A Civil Action Under §§ 106 Or 107.**

Congress amended CERCLA in 1986 by adding, among other things, § 113(f)(1).  That section codifies the existence of a contribution action under CERCLA and delineates the contours of that action:  "Any person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title, ***during or following*** any civil action under section 9606 of this title or under section 9607(a) of this title."  42 U.S.C. § 9613(f)(1) (emphasis added).  "Contribution," the First Circuit has explained, "is a standard legal term that enjoys a stable, well-known denotation."  *United Technologies Corp.* v. *Browning-Ferris Indus., Inc.*, 33 F.3d 96, 99 (1st Cir. 1994).  Section 113(f)(1) adopts this standard definition, so that CERCLA contribution "refers to a claim 'by and between jointly and severally liable parties for an appropriate division of the payment one of them has been compelled to make.'"  *Id.* (quoting *Akzo Coatings, Inc.* v. *Aigner Corp.*, 30 F.3d 761, 764 (7th Cir. 1994)).  As the Restatement puts it, "[a] person seeking contribution must extinguish the liability of the person against whom contribution is sought for that portion of liability, either by settlement with the plaintiff or by satisfaction of judgment."  Restatement of Torts (Third) § 23 cmt. b (2000).

Consistent with an understanding that contribution claims seek "division of the payment" that a liable party "has been compelled to make" (*United Technologies*, 33 F.3d at 99), § 113(f)(1) authorizes such claims only "during or following" a civil action brought under §§ 106 or 107 (42 U.S.C. § 9613(f)(1)).  In other words, the text of § 113(f)(1) clearly provides that a PRP may not seek contribution until a valid action for joint liability under §§ 106 or 107 is pending against it.  "[W]hen the statute's language is plain, the sole function of the courts — at

least where the disposition required by the text is not absurd — is to enforce it according to its terms." *Lamie* v. *United States Trustee*, 124 S. Ct. 1023, 1030 (2004). The text of § 113(f)(1) is plain, and consistent with traditional notions of contribution. Accordingly, CERCLA contribution actions may only take place "during or following" joint liability actions.

The Third Circuit, like the First, understands the term "contribution" in § 113(f)(1) "in its traditional, common law sense." *In re Reading*, 115 F.3d 1111, 1120 (3d Cir. 1997). Following this precedent, a district court in the Third Circuit recently held that "a contribution action requires (at least) a prior ongoing lawsuit." *E.I. DuPont de Nemours & Co.* v. *United States*, 297 F. Supp. 2d 740, 749 (D.N.J. 2003). The court in *E.I. DuPont* accordingly granted summary judgment against a PRP who had brought a contribution action under § 113(f)(1) prior to any action under §§ 106 or 107. *Id.* at 754.

The facts here parallel those in *E.I. DuPont*. Because the City is a PRP, it cannot bring a valid joint liability action against Citizens. See Part I *supra*. To date, no other party has instituted a valid action against the City under CERCLA §§ 106 or 107. The City is accordingly seeking contribution ***prior to***, not "***during or following*** any civil action under section 9606 * * * or under section 9607(a) * * *." 42 U.S.C. § 9613(f)(1) (emphasis added). For this reason, the Court should grant summary judgment against the City's CERCLA contribution claims.[2]

---

[2]      The United States Supreme Court recently granted *certiorari* in *Cooper Indus.* v. *Aviall Servs.*, No. 02-1192, to resolve the question of whether a party that has not been subject to a civil action under either §§ 106 or 107 may bring an action seeking contribution under § 113(f)(1). *Aviall* is currently scheduled to be argued during the October 2004 term. In all likelihood, the Court's opinion will definitively settle the viability of the City's contribution claim. See Rec. Dec. at 13 n.14. The Solicitor General of the United States has joined the *Aviall* petitioners in arguing that § 113(f)(1) does not authorize a contribution action prior to a suit under §§ 106 or 107(a). Unless the Supreme Court decides otherwise, the Solicitor General's *Aviall* brief constitutes the position of the United States on how § 113(f)(1)'s "during or following" language should be interpreted.

**B. In The Event The City's Contribution Action Is Allowed To Proceed, The City Bears The Burden Of Proving Citizens Equitable Share Of Liability, To The Exclusion Of All Third Parties.**

"In actions seeking contribution, unlike those for joint and several cost recovery, the burden is placed on the plaintiff to establish the defendant's equitable share of response costs." *Centerior Serv. Co.* v. *Acme Scrap Iron & Metal Corp.*, 153 F.3d 344, 348 (6th Cir. 1998); see *Acushnet*, 191 F.3d at 81. A contribution plaintiff is entitled to recover only "that portion of its costs that are in excess of its *pro rata* share of the aggregate response costs * * *." *United Technologies*, 33 F.3d at 103. Moreover, contribution defendants are severally liable, meaning that they cannot be forced to pay more than their equitable share of cleanup costs. Here, "because the City itself is a PRP, Citizens is exposed to liability for, ***at most, only its equitable share in the City's response costs***." Recommended Decision on Third-Party Defendant United States Army Corps of Engineers's Motion for Partial Judgment on the Pleadings and Motion to Dismiss All Third-Party Claims at 10 (citing *United Technologies*, 33 F.3d at 103).

The City's theory that Citizens is 100% responsible for all pollution in this portion of the Penobscot River is facially implausible. Citizens has already discussed the contamination that resulted from the City's own tar tanks and street paving operations. See *supra* Part I.C. In addition, the City has completely ignored the contributions of numerous third parties that have operated along Bangor's industrial waterfront since the 1850s. For example, the City's single-minded focus on Citizens resulted in the City's experts completely overlooking seven tar-filled pipes emptying into the Davis Brook sewer from the former site of the Bangor rail yard. See SMF ¶ 19. Testing by Citizens' experts has also revealed the presence of tar at the former Bangor rail switching yard and at the former site of a coal loading dock near the outfall of the Davis Brook sewer. See SMF ¶ 18. Furthermore, in spite of the exclusive attention the City has

paid to the Gas Works as a source of hazardous substances, the City has not produced any physical or documentary proof that the Bangor Gas Works facility was ever connected to the Davis Brook sewer line.

Even if the City could prove that some of the contamination in the river came from the Gas Works, it could not thereby hold Citizens exclusively responsible. Citizens merged Bangor Gas Company into itself in 1948 and then owned and operated the Gas Works only from 1948 to 1963, a period during which the Maine Department of Environmental protection concluded tar was not being released into the river. See SMF ¶ 35. From 1901 until 1928, the Gas Works facility was operated by American Gas Company and United Gas Improvement Company, which owned 100% of the stock in what was then known as Bangor Gas Light Company. SMF ¶ 20. Then, from 1928 to 1944, American Gas and Power Company and Public Utilities Management Corporation took over operation of the Gas Works and ownership of the Bangor Gas Light Company. SMF ¶ 21. Finally, from 1963 until 1978, the Gas Works facility was owned and operated by Maine Utility Gas Company. See Citizens Communications Company's Third Party Complaint Against North American Utility Construction Company. The successors of these companies are liable in equity as owners and operators of the Gas Works under CERCLA § 107(a)(2) and (3) during the time periods outlined above.[3]

The facts in this case are substantially more complicated than the City has been willing to admit. In light of this Court's judgment against the City's joint liability action, the City is attempting to transform its contribution action against Citizens into an action for full cost

---

[3]     It is noteworthy in this connection that third-party defendant Beazer East, Inc., is the successor to Koppers Company, which distributed all of the tar produced at the Gas Works from the 1950s until after Citizens sold the property in 1963. See Citizens Communications Company's Third Party Complaint Against Beazer East, Inc. ¶¶ 12-16. Consequently, Koppers was also an operator of the Gas Works facility.

recovery by declining to sue other parties who substantially contributed to the accumulation of hazardous substances in the Penobscot River. Citizens accordingly requests that the Court enter a judgment declaring that Citizens shall not be held liable for any cleanup costs unless the City proves those costs resulted from releases from the Gas Works caused by Citizens and that neither the City nor any third party is equitably responsible for such releases.

## III.   CITIZENS IS ENTITLED TO JUDGMENT ON THE CITY'S RCRA CITIZEN-SUIT CLAIMS FOR MONETARY AND INJUNCTIVE RELIEF (COUNT XVII).

In addition to four CERCLA counts, the City's Second Amended Complaint contains one other federal-law claim — a citizen suit filed pursuant to § 6972(a)(1)(B) of the Resource Conservation and Recovery Act ("RCRA"). Unlike CERCLA, "RCRA is not principally designed to effectuate the cleanup of toxic waste sites or to compensate those who have attended to the remediation of environmental hazards." *Meghrig* v. *KFC Western, Inc.*, 516 U.S. 479, 483 (1996). Yet the City's RCRA citizen suit blatantly seeks to accomplish precisely those things. Worse, by praying for recovery of cleanup costs under RCRA, the City has thumbed its nose at the Supreme Court's unambiguous holding in *Meghrig*. RCRA citizen suits are not designed for use in cases like the one at bar. The Court accordingly should grant summary judgment in Citizens' favor on Count XVII of the City's Second Amended Complaint.

### A.    The City Cannot Proceed With A Citizen Suit Because The State Of Maine Is Diligently Proceeding With A Remedial Action At The Site.

RCRA vests the Environmental Protection Agency and state regulatory agencies with the "[c]hief responsibility" for enforcing its provisions. See *Meghrig*, 516 U.S. at 483-84; 42 U.S.C. §§ 6928, 6972. Citizen suits exist as a "last resort," for use only when state and federal agencies completely abdicate their statutory responsibilities. See *Furrer* v. *Brown*, 63 F.3d 1092, 1098 (8th Cir. 1995). To that end, RCRA prohibits the filing of a citizen suit in certain cases,

including cases where the EPA or a state agency "has incurred costs to initiate a Remedial Investigation and Feasibility Study under section 104 of [CERCLA] and is diligently proceeding with a remedial action under [CERCLA]." 42 U.S.C. § 6972(b)(2)(B), (C)(iii). This is not one of the "last resort" cases in which government inaction necessitates a citizen suit. Rather, the City's suit fits squarely within § 6972(b)(2)'s prohibition on citizen suits where federal or state authorities have identified and are proceeding to address an environmental problem.

On August 2, 2001, the City and Maine DEP entered a Memorandum of Agreement in which they promised to share costs associated with an investigation of the alleged tar slick in the Penobscot River. See Compl. ¶ 28; SMF ¶ 22. Under this agreement, the state committed to reimburse the City for up to $250,000 of costs associated with the conduct of an "Additional River Investigation, Ecological Risk Assessment and Human Health Assessment and Feasibility Study * * * to assess remediation options concerning the tar deposit." Memorandum of Agreement (Summ. J. Exhibit 31) ¶¶ 2.2, 4.2; SMF ¶ 23. In short, DEP agreed to expend state funds for remedial investigation and a "Feasibility Study." SMF ¶ 25.

In September 2003, the City and DEP held a joint public meeting to "present the findings of the remedial investigation." Summ. J. Exhibit 32; SMF ¶ 25. During this meeting, DEP's representative, Kathy Niziolek, explained that DEP's process in cooperation with the City included "risk assessments" that "follow state and federal guidelines."[4] Summ. J. Exhibit 42 at 14. Niziolek further stated that DEP "had completed the remedial investigation of the Bangor Landing Site" and was thus prepared to "initiate[] the feasibility study." Summ. J. Exhibit 42 at

---

[4] While some courts have concluded that the prohibition on citizen suits found in § 6972(b)(2)(C)(iii) requires "a joint federal-state cooperative agreement under CERCLA § 104(d)(1)" (*Orange Environment, Inc.* v. *County of Orange*, 860 F. Supp. 1003, 1028 (S.D.N.Y. 1994), such a narrow reading of the statutes would virtually render subsection (C)(iii) superfluous.

22. Niziolek then outlined the next steps in DEP's process toward selection of a final remedy. *Id.*

Since the September public meeting, DEP has circulated a draft Designation of Uncontrolled Hazardous Substance Site identifying the Bangor Landing Site (including the Davis Brook sewer and the former site of the Bangor Gas Works) as an uncontrolled site pursuant to 38 M.R.S.A. § 1364. See Summ. J. Ex. 35. Final issuance of this designation is apparently imminent. See Summ. J. Exhibit 34. While Citizens will contest many of the factual findings in the designation, the detailed character of those proposed findings underlines once again the diligence with which the state is pursuing remediation at the Bangor Landing Site.[5] See SMF ¶ 26.

RCRA citizen suits are an "interstitial" remedy, "generally only viable where neither the federal [or] state governments act to remedy the problem." *Organic Chemicals Site PRP Group* v. *Total Petroleum, Inc.*, 6 F. Supp. 2d 660, 664 (W.D. Mich. 1998); see also *Meghrig*, 516 U.S. at 486 ("[N]o citizen suit can proceed if either the EPA or the State has commenced, and is diligently prosecuting, a separate enforcement action" (citation omitted).). Ironically, the City commenced the instant citizen suit in November 2002, at the same time it was receiving state funds for a remedial investigation and feasibility study of the alleged tar problem in the Penobscot River. From the time of its agreement with the City until the present, Maine DEP has been integrally involved in ongoing remedial activity at what it officially calls the Bangor

---

[5]     It is important to take note of the contrast between §§ 6972(b)(2)(C)(ii) and (iii). The former bars citizen suits when the state is "***actually engaging*** in a ***removal*** action," while the latter requires no more than that the state is "***diligently proceeding*** with a ***remedial*** action." (Emphasis added.) This contrast in wording indicates that in cases like the one at bar that involve longer-term "remedial action" (as opposed to short-term "removal action"), citizen suits are prohibited even before the state actually engages in a cleanup, so long as progress toward an eventual cleanup is occurring.

Landing Site. DEP's ongoing work leaves no interstices for the City's citizen suit to fill. The Court should therefore dismiss the City's RCRA citizen suit in its entirety.

B.    **The City Cannot Recover Past Or Future Money Damages Under RCRA's Citizen-Suit Provision.**

The prayer for relief following the City's RCRA claim asks for a judgment "ordering Citizens to pay all of the costs the City has incurred in connection with investigation, corrective action, and other response actions associated with the solid wastes and hazardous wastes in the tar slick in the Penobscot River." Compl. at 32. Such relief is explicitly barred by the Supreme Court's holding in *Meghrig*. As the unanimous Court put it, "Congress did not intend for a private citizen to be able to undertake a cleanup and then proceed to recover its costs under RCRA." *Meghrig*, 516 U.S. at 487. Thus, "*§ 6972(a) does not contemplate the award of past cleanup costs* * * *." *Id*. at 488 (emphasis added). Because paragraph (b) of the City's RCRA prayer for relief requests exactly the type of relief prohibited by *Meghrig* — an award of past response costs — the Court should enter judgment denying that portion of the City's claim.

Paragraph (c) of the City's RCRA prayer for relief similarly requests a judgment "ordering Citizens to pay all future response costs incurred by the City in this matter." Compl. at 32. While this question was not directly before the Supreme Court in *Meghrig*, the logic of the *Meghrig* opinion strongly militates against awarding any monetary damages under RCRA, past or future. Examining the text of RCRA's citizen-suit provision, the Supreme Court concluded that Congress "knew how to provide for the recovery of cleanup costs, and that the language used to define the remedies under RCRA does not provide that remedy." *Meghrig*, 516 U.S. at 485. RCRA's citizen-suit provision instead limits district courts to issuing either "a mandatory injunction, *i.e.*, one that orders a responsible party to 'take action' * * * or a prohibitory injunction, *i.e.*, one that 'restrains' a responsible party from further violating RCRA." *Id*. at 484.

The conspicuous lack of a response-cost remedy in RCRA's citizen-suit framework indicates that Congress has not authorized courts to award past or future costs to citizen-suit plaintiffs. See *Furrer*, 63 F.3d at 1100; *Andritz Sprout-Bauer, Inc.* v. *Beazer East, Inc.*, 174 F.R.D. 609, 617-18 (M.D. Pa. 1997); *Express Car Wash Corp.* v. *Irinaga Bros., Inc.*, 967 F. Supp. 1188, 1193 (D. Or. 1997) ("Federal courts addressing the issue have universally held that RCRA suits provide no damages remedy.") (citing cases). The Court accordingly should enter judgment prohibiting the City from recovering past or future response costs under RCRA, if it allows the City's RCRA claims to go forward at all.

IV. **IF THE COURT ENTERS JUDGMENT AGAINST THE CITY'S FEDERAL CLAIMS, IT SHOULD DECLINE TO EXERCISE SUPPLEMENTAL JURISDICTION OVER THE CITY'S STATE LAW CLAIMS.**

The City's Second Amended Complaint contains five federal claims: the various CERCLA claims in Counts I through IV and the RCRA citizen-suit claim in Count XVII. Citizens has argued above that it is entitled to dismissal or summary judgment with regard to all five of these federal law counts. Since these are the only claims over which this Court has original jurisdiction, their dismissal would authorize the Court to "decline to exercise supplemental jurisdiction" over the City's remaining state law counts. 28 U.S.C. § 1367(c)(3). In dismissing supplemental state law claims, "the trial court must take into account concerns of comity, judicial economy, convenience, fairness, and the like." *Roche* v. *John Hancock Mut. Life Ins. Co.*, 81 F.3d 249, 256-57 (1st Cir. 1996).

The major component of the City's complaint is found in Counts I through IV, which seek relief under CERCLA. This is illustrated by the City's factual recitation, which is obviously geared toward establishing its federal claims. See Compl. ¶¶ 20, 20A, 21, 22 (specifically alleging the presence of "hazardous substances" and "hazardous wastes" as those

terms are defined under CERCLA and RCRA).  Should the Court eliminate the City's CERCLA

and RCRA claims from this lawsuit, it is well within the Court's discretion to dismiss the City's

tag-along state law claims.  Those claims, for reasons discussed *infra*, are meritless — some of

them patently so.  It would be unfair to Citizens and the third-party defendants to proceed with

the present action solely on such a questionable foundation.  Furthermore, dismissal of the City's

state law claims would advance the interests of judicial economy and convenience by allowing

Maine DEP to determine in the first instance how this cleanup should be handled.  These

considerations counsel an exercise of the Court's discretion to dismiss the City's supplemental

state law claims.

## V.     CITIZENS IS ENTITLED TO JUDGMENT ON ALL OF THE CITY'S PUBLIC NUISANCE CLAIMS (COUNTS V, VI, VII, VIII, X, XI, XIV AND XV).

Eight of the City's twelve state-law counts involve claims for public nuisance —

although if the City had properly understood Maine's statutory nuisance scheme, both numbers

would have been lower.  Regardless, the City cannot prevail on any of its public nuisance causes

of action.  Maine law requires that a public nuisance plaintiff suffer injuries different in kind

from the general public.  The City has produced no evidence of such peculiar damage.

### A.     The Court Should Dismiss All Of The City's Statutory Nuisance Counts Not Based On 17 M.R.S.A. § 2701 (Counts VI, VII, VIII And IX) Because Only § 2701 Creates A Cause Of Action.

Section 2701 of M.R.S.A. Title 17 provides that "[a]ny person injured in his comfort,

property or the enjoyment of his estate by a common and public or a private nuisance may

maintain against the offender a civil action for damages, unless otherwise specially provided."

In *Charlton* v. *Town of Oxford*, 774 A.2d 366, 374 (Me. 2001), the Maine Law Court further

explained that "statutory causes of action pursuant to Title 17 M.R.S.A. § 2701 are limited to

those nuisances delineated in the statute."  In other words, § 2701 creates a cause of action for

private individuals based solely on the nuisances defined in 17 M.R.S.A. §§ 2741 and 2791-2806. *Id*. Correspondingly, the nuisances defined in §§ 2741 and 2791-2806 are actionable solely under the provisions of § 2701.

The City's Second Amended Complaint includes but one count (Count V) based on § 2701. Two counts (VI and IX) are purportedly brought under 17 M.R.S.A. § 2702. This section, unlike § 2701, does not create grounds for maintenance of a civil suit. Instead, § 2702 adds to § 2701's "damages" remedy by authorizing "the court" to "order the nuisance abated or removed at the expense of the defendant." 17 M.R.S.A. § 2702. Moreover, § 2702 only becomes relevant when a "person is adjudged guilty of a nuisance," presumably under § 2701. *Id*. This prerequisite that the defendant be held liable for a nuisance prior to issuance of a § 2702 order excludes the possibility that § 2702 creates liability on its own. So while § 2702 permits the City to request injunctive relief in connection with its § 2701 cause of action, it does not authorize the City to file two entirely separate causes of action. Counts VI and IX accordingly should be dismissed.

The City's Second Amended Complaint also contains two counts (Counts VII and VIII) filed under 17 M.R.S.A. § 2802. That section, as *Charlton* makes clear, is purely definitional. See 774 A.2d at 374. The first sentence of § 2802, in which a laundry list of activities concludes with the definitional phrase "are nuisances within the limitations and exceptions mentioned" (17 M.R.S.A. § 2802), underlies *Charlton*'s understanding. Section 2802 is meant purely to "delineate" those activities that qualify as statutory nuisances. See *Charlton*, 774 A.2d at 374. It provides no more grounds for a suit than a definitional section in CERCLA or any other statute. The Court therefore should dismiss Counts VII and VIII of the City's Second Amended Complaint.

**B.** **The City Does Not Allege, Nor Has It Suffered, The "Special And Peculiar Damages" Necessary To Bring A Public Nuisance Claim.**

After its improper statutory public nuisance counts are eliminated, the City is left with one statutory and two common law claims for public nuisance, Counts V, X and XI.[6]  In order to proceed with any public nuisance claim in Maine, "a party must show that he has 'suffered therefrom some special and peculiar damages other and greater than those sustained by the public generally.'"  *Charlton*, 774 A.2d at 375 (quoting *Brown* v. *Watson*, 47 Me. 161, 162 (1859).  Putative plaintiffs who simply share in the harm to the community at large do not have standing to sue.  See  *Hanlin Group, Inc.* v. *International Minerals & Chemical Corp.*, 759 F. Supp. 925, 937 & n.15 (D. Me. 1990).  A plaintiff must instead suffer an "actual injury" that is different in kind from that endured by the general populace.  *Charlton*, 774 A.2d at 376.

As an initial matter, no allegation of special and peculiar damages appears in the City's plethora of public nuisance counts.  Those counts articulate no injury other than that the contamination in the Penobscot River is "interfer[ing] with the health, safety, peace, comfort, or convenience of the *general community*."  Compl. ¶¶ 53, 60 (emphasis added).  This is precisely the sort of allegation that will not confer standing on an individual public nuisance plaintiff.  See *Charlton*, 774 A.2d at 375-76.

The closest any portion of the City's most recent complaint comes to asserting an injury to the City as a corporate entity is an allegation that hazardous substances "continue to migrate and spread in the Penobscot River to the detriment of the public welfare and property owned by the City."  Compl. ¶¶ 70, 74.  This Court has previously determined, however, that allegations of "property value loss" and "impairment of [the] right to use and enjoy [] property" do not satisfy

---

[6]     The City's public nuisance declaratory judgment claims, Counts XIV and XV, rise and fall with these underlying substantive claims.

Maine's special injury requirement. *Hanlin Group*, 759 F. Supp. at 936. In Maine, "[t]here must be an infringement of the plaintiff's private rights to permit recovery at law or relief in equity." *Smedberg* v. *Moxie Dam Co.*, 92 A.2d 606, 608 (Me. 1952). When a drop in property value or usefulness results from the infringement of a public right — like the contamination of the Penobscot River — it cannot as a matter of law create standing to bring an individual claim for public nuisance. See *Hanlin Group*, 759 F. Supp. at 936. By the same token, response cost expenditures do not provide sufficient foundation for an individual public nuisance suit where the individual has not otherwise claimed infringement of a private right. See *id.*

Claims for purely pecuniary losses like the City's are not different in kind from losses endured by the general community unless "the plaintiff has an established business making commercial use of the public right with which the defendant interferes." *Id.* (quoting W. Prosser, *Law of Torts* § 88 at 590 (4th ed. 1971)). The City has neither alleged nor offered any evidence that it has an active business interest in the cleanliness of the Penobscot River. The Court must therefore grant judgment in Citizens' favor on all of the City's public nuisance claims.

## VI. CITIZENS IS ENTITLED TO JUDGMENT ON ALL OF THE CITY'S PRIVATE NUISANCE CLAIMS (COUNTS IX, XII, XIV AND XV).

Private nuisance suits are meant as a remedy between neighboring contemporaneous landowners. The City is attempting to recover in private nuisance from a prior owner of non-adjacent property, even though the City was fully cognizant of the affected property's condition long before purchasing it. These circumstances will not suffice to create a private nuisance cause of action. In addition, the present record is devoid of evidence that Citizens or any of the other operators of the Bangor Gas Works ever intended to interfere with the use and enjoyment of anyone's land. Finally, the City's continued use and enjoyment of the property it owns along the

Penobscot River, dispels the notion that historical activities at the Gas Works have resulted in any sort of interference.  Citizens requests summary judgment on each of these grounds.

### A. The City Cannot Recover In Private Nuisance From A Prior Owner Of Non-Adjacent Property.

The vast majority of courts "have consistently rejected allowing a subsequent landowner to recover in private nuisance from a prior landowner." *Regional Airport Authority of Louisville & Jefferson County* v. *LFG, LLC*, 255 F. Supp. 2d 688, 691 (W.D. Ky. 2003).  The District of Maine long ago joined this majority by "conclud[ing] that the Law court would not recognize a cause of action for private nuisance between vendor and vendee." *Hanlin Group*, 759 F. Supp. at 935.  The majority rule stems from "the historical role of private nuisance as a means of efficiently resolving conflicts between neighboring contemporaneous land uses." *Philadelphia Elec. Co.* v. *Hercules, Inc.*, 762 F.2d 303, 314 (3d Cir. 1985) (emphasis omitted).  Courts have regularly concluded that allowing a nuisance suit between a purchaser and a seller does not comport with this traditional purpose, and should therefore be rejected.  See *LFG*, 255 F. Supp. at 691-92 (citing cases).

The City's nuisance suit is even farther afield than the vendor-vendee suit rejected in *Hanlin Group*.  The City's private nuisance claims represent the attempt of a subsequent purchaser of affected property to recover damages from a prior owner of different property.  This two-fold separation from the initial owners of the relevant properties eviscerates any possible proof of intent on Citizens' behalf.  See *Charlton*, 774 A.2d at 377 (requiring "the intent of interfering with the use and enjoyment of the land" as an element of private nuisance).  The historical owners of the Gas Works property simply could not have known 30 years or more ahead of time that the City would buy the property along the river.  Consequently, the Gas

Works owners could not have intended to interfere with the City's use and enjoyment of that property.

The City's private nuisance suit must also be rejected because it cannot possibly have the effect of "resolving conflicts between neighboring contemporaneous land uses." *Philadelphia Elec.*, 762 F.2d at 314. Nuisance law is traditionally used "to achieve efficient and equitable solutions to problems created by discordant land uses." *Id.* (emphasis and footnote omitted). Given that both properties at issue here are now being used in an entirely different manner than when the alleged nuisance originated, it goes without saying that any land-use conflicts involving the Gas Works have long since been resolved.

Courts also have regularly concluded that private nuisance actions are inappropriate "where the land was purchased with knowledge of the nuisance's existence." *LFG*, 255 F. Supp. at 692; see *Hanlin Group*, 759 F. Supp. at 935. Purchasers of land are generally in a position to evaluate potential nuisances and account for their existence in negotiating the purchase price. *Philadelphia Elec.*, 762 F.2d at 314-15. In this case, the City knew about the pollution in the Penobscot River long before it bought the rail yard property. SMF ¶ 29. Indeed, the City negotiated a price-reduction with the rail yard's former owners based on contamination at the property. See SMF ¶ 32. In return, the City agreed to "irrevocably waive[], give[] up, and renouce[] any and all claims" against the railroad relating to hazardous wastes on the property. Summ. J. Exhibit 36 ¶ 17. The City furthermore "assume[d] any and all * * * liabilities" with respect to, among other things, "underground facilities" and "drainage culverts" located on the riverfront property (Summ. J. Exhibit 40 ¶ 5; SMF ¶ 33), which would include liability related to the underground Davis Brook sewer.

For all these reasons, the Court should not sanction the City's unprecedented use of a private nuisance suit. Summary judgment against all private nuisance counts in the City's complaint is appropriate.

**B.    The City Failed To Produce Evidence That Citizens Had The Requisite Intent To Interfere With The Use And Enjoyment Of Land.**

The Maine Law Court has identified four elements that are "necessary to satisfy a common law cause of action for private nuisance":

> (1)  The defendant acted with the intent of interfering with the use and enjoyment of the land by those entitled to that use; (2) There was some interference with the use and enjoyment of the land of the kind intended, although the amount an extent of that interference may not have been anticipated or intended; (3) The interference that resulted and the physical harm, if any, from that interference proved to be substantial * * *, (4) The interference that came about under such circumstances was of such a nature, duration or amount as to constitute unreasonable interference with the use and enjoyment of the land * * *.

*Charlton*, 774 A.2d at 377 (quoting W. Page Keeton *et al.*, Prosser and Keeton on the Law of Torts § 87 at 622-23 (5th ed. 1984)).[7]

Even if a nuisance suit between a subsequent owner and a prior, non-adjacent owner were possible, the City could not demonstrate that the operators of the Gas Works intentionally interfered with the use and enjoyment of the riverfront property currently owned by the City of Bangor. *Charlton*, 774 A.2d at 377. While direct proof of a defendant's mental state is not necessary, the plaintiff at least must show that "the defendant has created or continued the condition causing the interference with full knowledge that the harm to the plaintiff's interests

---

[7]      Count IX of the City's Second Amended Complaint purports to state a statutory private nuisance claim under 17 M.R.S.A. § 2702.  See Compl. ¶ 54.  As discussed *supra*, § 2702 applies only when a party has already been "adjudged guilty of a nuisance."  17 M.R.S.A. § 2702.  It does not create a cause of action.  The City therefore has not stated a valid statutory private nuisance claim, which would have to arise under § 2701 and seek recovery for one of the statutorily-defined nuisances in §§ 2791-2806.  See *Charlton*, 774 A.2d at 374.

are occurring or are substantially certain to follow." *Id.* at 377 n.11. The City has produced no evidence probative of this point.

The City offered no direct evidence that the operators of the Bangor Gas Works knew or believed that their activities could hinder the use and enjoyment of property that was for most of the period in question a railroad switching yard. In answering one of Citizens' interrogatories, the City claims that through membership in various industry organizations, the operator of the Gas Works "was aware that their [*sic*] continuing discharge of filth would damage the downstream environment." See Plaintiff's Responses to Defendant Citizens Communications Company's First Set of Interrogatories ("City's Interrog. Resp.") No. 22. Assuming for the sake of argument that the Gas Works operator had some awareness of potential downstream environmental harms, such awareness is a far cry from "full knowledge" that harm would occur at the railroad yard property.

Knowledge of harm to the usefulness of the railroad property is impossible because the portion of the property affected by discharges from the Davis Brook sewer was never a part of the railroad's operations. Indeed, the property that the City's experts have identified as being contaminated with tar lies underneath the Penobscot River except during low tides. SMF ¶ 34. To the extent that the operators of the Gas Works had any idea that this portion of the property was being contaminated, they could not have expected that contamination to affect the use or enjoyment of the property as a rail yard. Under these circumstances, the City cannot demonstrate that the Gas Works operators created a nuisance with "full knowledge" that harm to the railroad's interests was "occurring or [was] substantially certain to follow." *Charlton*, 774 A.2d at 377 n.11. Absent proof on this point, the City cannot recover on its claims for private nuisance.

### C. The City Has Not Demonstrated A Substantial Interference With The Use Or Enjoyment Of Its Land.

Since the City is alleging a continuing private nuisance from activities at the Gas Works (see Compl. ¶¶ 64, 65, 79, 80), it presumably must demonstrate the ongoing existence of a "substantial" or "significant" interference with its use and enjoyment of the property at issue.[8] *Charlton*, 774 A.2d at 377 & n.10; see *Hanlin Group*, 759 F. Supp. at 935. One reason the City cannot meet this burden has already been mentioned: the portion of the City's property allegedly contaminated with hazardous substances is underwater the vast majority of the time. See SMF ¶ 34. The City is also putting the above-water parts of its 30-acre parcel to use, including as the site of an annual folk life festival that draws thousands of people to Bangor. See http://www.nationalfolkfestival.com. While the City might like to develop its property further, private nuisance suits are not meant to provide seed money for municipal projects. Accordingly, the Court should grant Citizens motion for summary judgment with respect to the City's private nuisance claims.

## VII. CITIZENS IS ENTITLED TO JUDGMENT ON THE CITY'S STRICT LIABILITY FOR ULTRAHAZARDOUS ACTIVITY CLAIM (COUNT XIII).

### A. The Maine Law Court Has Rejected Causes Of Action Based On Strict Liability For Ultrahazardous Activity.

Count XIII of the City's Second Amended Complaint alleges that by operating the Gas Works and disposing of wastes produced during the gas manufacturing process, Citizens was engaged in an "abnormally dangerous activity." Compl. ¶ 86. According to the City, Citizens must be held strictly liable for any damages that resulted from the operation of the Gas Works, regardless of whether such damages were negligently caused. See *id*. ¶¶ 84, 87. The Maine Law

---

[8] The awkwardness of this inquiry results from the fundamental defect in the idea of bringing a private nuisance claim against a prior landowner. See *supra*.

Court, however, has rejected the strict liability theory underlying Count XIII in the clearest possible terms.

The Law Court took up the question of strict liability for ultrahazardous activity in the case of *Reynolds* v. *W.H. Hinman Co.*, 75 A.2d 802 (1950). The plaintiffs in *Reynolds* claimed that they suffered property damage when the defendant used dynamite to "blast[] rock formations and ledges" as part of construction work on U.S. Highway 1. *Id*. at 803. In the first count of their complaint, the plaintiffs sought application of "the rule of absolute liability," *i.e.*, "that a man, though acting entirely without fault, is liable for the damaging consequences of his innocent acts." *Id*. at 804. The Law Court explicitly recognized that under the plaintiffs' theory, recovery "is not founded on negligence or fault or liability but is presumed from the circumstances of the action." *Id*. By 1950, several other states had adopted the plaintiffs' proposed "rule of absolute liability," and the Law Court in *Reynolds* found that the defendant's objection to the first count of the plaintiffs' complaint "squarely put" at issue the validity of the absolute liability rule in Maine. *Id*.

The Law Court's lengthy opinion in *Reynolds* evidences the seriousness with which the court considered the question before it. The court reviewed scholarly works on absolute liability and was well aware of *Rylands* v. *Fletcher*, 3 L.R.-E. & I. App. 330, 338-39 (H.L. 1868), the case generally recognized as introducing the doctrine of strict liability for ultrahazardous activity. See *id*. at 807; Jed Handelsman Shugerman, *The Floodgates of Strict Liability: Bursting Reservoirs and the Adoption of* Fletcher v. Rylands *in the Gilded Age*, 110 Yale L.J. 333, 337-38 (2000). The Law Court thus understood its choice to be between the "general rule which requires fault as an element of liability" and the strict liability "exceptions" that some

courts had adopted for "extra hazardous acts." *Reynolds*, 75 A.2d at 348-49 (quoting Jeremiah

Smith, *Liability for Damage to Land by Blasting*, 33 Harv. L. Rev. 542, 550 & n.35 (1920)).

After thorough discussion of the available authorities, the Law Court unambiguously

concluded that "the only logical rule for this Court to adopt is the rule that ***fault is a requisite for***

***liability***. The other rule — that of absolute liability — seems to this court to be a rule of

hardship which if used would necessitate many exceptions." *Id*. at 811 (emphasis added). This

holding represented a complete rejection of the strict liability for ultrahazardous activities rule

set out in *Rylands* v. *Fletcher*, and it has since been recognized as such. See 57A Am. Jur. 2d

Negligence § 382 (footnoting *Reynolds* to illustrate that "not all courts adhere to the doctrine of

absolute or strict liability"); Shugerman, 110 Yale L.J. at 345 & n.96 (identifying Maine as a

state that, in *Reynolds*, "shifted against *Rylands*"). The Maine Law Court has never overturned

its holding in *Reynolds*. Accordingly, Maine law does not recognize a strict liability cause of

action for ultrahazardous or abnormally dangerous activity.[9]

Despite the clear holding of *Reynolds*, the District of Maine has on several occasions

stated that "Maine 'would likely recognize a cause of action for strict liability for the disposal

and storage of hazardous waste.'" *Lefebvre* v. *Central Maine Power Co.*, 7 F. Supp. 2d 64, 72

(D. Me. 1998) (quoting *Murray* v. *Bath Iron Works Corp.*, 867 F. Supp. 33, 48 (D. Me. 1994)).

This statement dates back to *Hanlin Group*, where the court concluded that the imposition of

strict liability for ultrahazardous activity was "not inconsistent with the actual holding of

*Reynolds*." 759 F. Supp. at 933.

---

[9]     Maine is not alone in rejecting of strict liability for ultrahazardous activity. See, *e.g.*,
*Bruzga* v. *PMR Architects, P.C.*, 693 A.2d 401, 404-05 (N.H. 1997) ("Strict liability for damages
has traditionally met with disfavor in this jurisdiction."); *Prather* v. *Brandt*, 981 S.W.2d 801, 804
(Tex. App. 1998) ("Texas does not recognize a cause of action of strict liability for
'ultrahazardous' or 'abnormally dangerous' activities.").

*Hanlin Group*'s reading of *Reynolds* is untenable. The Law Court did not spend six pages discussing the "squarely put" question of whether it should adopt "the rule of absolute liability" (75 A.2d at 804) only to resolve the case on other grounds in a single sentence. While the Law Court did observe that the blasting in *Reynolds* was, "so far as the record discloses * * * a reasonable use of property," it made that observation in furtherance of its holding "that negligence must not only be alleged, but it must be proved." *Id*. at 811. That is to say, in addition to rejecting plaintiffs' strict liability cause of action, the court in *Reynolds* observed that the defendant's use of dynamite was "reasonable" in order to exclude negligence-based liability as well.

*Hanlin Group*'s contrary contention —if blasting was reasonable, it therefore was not abnormally dangerous (759 F. Supp. at 933) — misunderstands the fundamental point of the strict liability rule. Strict liability is designed to award damages for abnormally dangerous activity regardless of whether the activity is conducted reasonably. *Reynolds*, 75 A.2d at 804. *Reynolds* rejected such a "rule of absolute liability." *Id*. at 804, 811. *Hanlin Group* essentially got *Reynolds* backwards. It therefore provides no authority for the proposition that Maine would allow a strict liability cause of action for ultrahazardous activity.

This Court "is bound to interpret state law in accordance with state rules of decision * * *." *Smith* v. *Heritage Salmon, Inc.*, 180 F. Supp. 2d 208, 219 (D. Me. 2002). Maine law, as expressed in *Reynolds*, has specifically rejected strict liability for ultrahazardous activities in favor of "the rule that fault is a requisite for liability." 75 A.2d at 811. The Court must enter judgment against Count XIII of the City's Second Amended Complaint, which is wholly based on a theory of strict liability for ultrahazardous activities that remains unrecognized in Maine.

**B.      Maine's Statute Of Limitations Bars The City's Strict Liability Claims.**

Even if Maine recognized a cause of action for strict liability under the circumstances of this case, Maine's 6-year statute of limitations would nonetheless bar the City's claim.  Section 752 of M.R.S.A. Title 14 commands that "[a]ll civil actions shall be commenced within 6 years after the cause of action accrues and not afterwards * * * except as otherwise specially provided."  Since there are no special provisions in Maine law regarding strict liability for ultrahazardous activities, the City's claim is governed by § 752's 6-year statute of limitations. The City was accordingly required to file its strict liability claim not later than 6 years after the cause of action accrued.

"[A] cause of action sounding in tort usually accrues at 'the point at which a wrongful act produces an injury for which a potential plaintiff is entitled to seek judicial vindication.'"  *Dugan* v. *Martel*, 588 A.2d 744, 746 (1991).  Although the City's strict liability claim does not require proof that the damaging act was "wrongful," it still qualifies as "a cause of action sounding in tort."  Apart from "narrow exceptions" not relevant here,[10] "mere ignorance of a cause of action does not prevent the statute of limitations from running."  *Id*.

The injury-producing actions in this case allegedly took place during the years 1851 to 1963.  Compl. ¶¶ 8, 17-19.  Under the City's own theory, these actions produced immediate compensable injuries, including "the discharge of tar and tar-laden wastewaters to the Penobscot River."  *Id.* ¶ 19.  The City accordingly had 6 years from the most recent allegedly injury-producing action in 1963 to file suit.  See 14 M.R.S.A. § 752; *Johnston* v. *Dow & Coulombe, Inc.*, 686 A.2d 1064, 1066 (Me. 1996) (finding that the 6-year statute of limitations began to run

---

[10]      The current exceptions are for "legal malpractice, foreign object and negligent diagnosis medical malpractice, and asbestosis."  *Johnston* v. *Dow & Coulombe, Inc.*, 686 A.2d 1064, 1066 (Me. 1996).

when the plaintiffs suffered an injury, even though they had yet to suffer any "pecuniary loss"). Obviously, the City did not sue within the allotted period. The Court therefore should enter judgment against the City's strict liability for ultrahazardous activity claim based on Maine's 6-year statute of limitations.

C.  **The City Cannot Recover Based On Strict Liability Because Operating A Manufactured Gas Plant Is Not An Ultrahazardous Or Abnormally Dangerous Activity.**

Even if Maine law recognized strict liability for ultrahazardous activities and even if the City had timely filed its claim against Citizens, no grounds exist for determining that operation of a manufactured gas plant qualifies as an ultrahazardous activity. The Restatement lists six factors that courts should consider "[i]n determining whether an activity is abnormally dangerous." Restatement (Second) of Torts § 520. Those factors include the "existence of a high degree of risk of some harm," a "likelihood" that any resulting harm "will be great," an "inability to eliminate the risk by the exercise of reasonable care," the extent to which the activity is uncommon, the "inappropriateness of the activity to the place where it is carried on," and the "extent to which its value to the community is outweighed by its dangerous attributes." *Id*. The Seventh Circuit Court of Appeals has succinctly summarized the rationale behind the Restatement's factors by explaining that "[w]hen the danger of accident can be adequately contained by taking care rather than by eliminating or truncating the activity that creates the danger, there is no compelling reason to impose strict liability." *G.J. Leasing Co.* v. *Union Elec. Co.*, 54 F.3d 379, 387 (7th Cir. 1995).

Based on the record in this case, operation of the Bangor Gas Works cannot be considered an ultrahazardous or abnormally dangerous activity. Although the City's complaint artfully states that "[t]he manufacture of gas was not a common activity in Bangor or elsewhere

in Maine" (Compl. ¶ 85), it fails to mention that no town Bangor's size needed more than one gas plant. There were in fact numerous manufactured gas plants operating across the United States from the middle of the 19th century through the 1960s. These plants were considered valuable public utilities and as such were regulated by bodies like the Maine Public Utilities Commission. They could be and were operated safely with the application of ordinary care. For these reasons, operation of a manufactured gas plant was not an ultrahazardous activity.

For similar reasons, "the greater weight of authority appears to be against extending strict liability to the hazardous waste context" in general. *Sealy Connecticut, Inc.* v. *Litton Indus., Inc.*, 989 F. Supp. 120, 126 (D. Conn. 1997). "Absolute liability attaches only to ultrahazardous or abnormally dangerous **activities** and not to ultrahazardous or abnormally dangerous **materials**." *Splendorio* v. *Bilray Demolition Co., Inc.*, 682 A.2d 461, 465-66 (R.I. 1996) (emphasis in original). The operators of the Bangor Gas Works admittedly dealt with hazardous substances in the course of their business, but those dealings were merely incidental to the Gas Works' ordinary manufacturing activities.[11] Because the manufacturing activities were not themselves ultrahazardous, the Gas Works' operators should not be subject to strict liability.

## VIII. BECAUSE IT CANNOT PROVE THAT THE OPERATORS OF THE GAS WORKS ACTED WITH ACTUAL OR IMPLIED MALICE, THE CITY IS NOT ENTITLED TO RECOVER PUNITIVE DAMAGES (COUNT XVI).

Maine's law of punitive damages is built around the understanding that "although punitive damages serve an important function in our legal system, they can be onerous when loosely assessed." *Tuttle* v. *Raymond*, 494 A.2d 1353, 1363 (Me. 1985). In order to strictly limit the situations in which punitive damages are awarded, the Maine Law Court determined that a

---

[11]     To the extent the City is alleging that handling tar is ultrahazardous or abnormally dangerous, the City would be strictly liable for its own extensive handling of tar at its tar tanks (see SMF ¶ 10), in paving the streets of Bangor (see SMF ¶ 14), and in its cleanup of the Gas Works property (see SMF ¶ 30).

plaintiff may recover them "only if he can prove by clear and convincing evidence that the defendant acted with malice." *Id*. Because the City has presented absolutely no evidence showing that the Gas Works operators were "motivated by ill will toward the plaintiff," it is constrained to argue that the Gas Works operators' conduct was "so outrageous that malice toward a person injured as a result of that conduct can be implied." *Id*. at 1361. Even viewing the record in the light most favorable to the City, it is impossible to conclude that it contains clear and convincing evidence that the operators of the Bangor Gas Works were maliciously polluting the Penobscot River.

In its interrogatory answers, the City claimed that it could demonstrate implied malice on behalf of the Gas Works operators by showing that they continued to manufacture gas despite being "aware that their continuing discharge of filth would damage the downstream environment." City's Interrog. Resp. No. 22. This allegation, even if it were true, is completely insufficient to justify punitive damages. There is no evidence in the record indicating that the Gas Works' operation was out of accord with industry norms. Indeed, the City itself theorizes that the Gas Works was complying with the City's 1852 directive by ordering the plant to place all its "filth" into a "covered drain." See SMF ¶ 3.

A finding of ***implied*** malice requires conduct so atrocious and out-of-the-ordinary that a factfinder can conclude the defendant was motivated by ill will even without direct evidence of the defendant's state of mind. See *Tuttle*, 494 A.2d at 1361. The City's theory, by contrast, would essentially ***impute*** malice to any person who was aware that their conduct might have adverse effects on the environment, regardless of whether malice could fairly be implied from the person's actions. Such an argument is hopelessly out of line with Maine punitive damages

law.  The Court should accordingly grant judgment in Citizens favor as to Count XVI of the City's Second Amended Complaint.

## IX.   CITIZENS' EQUITABLE DEFENSES BAR THE CITY'S CLAIMS IN THEIR ENTRETY.

### A.   Because The City Unreasonably And Prejudicially Delayed Filing A Complaint, Laches Bars The Present Action.

"Laches," as the Maine Law Court has explained, "is an omission to assert a right for an unreasonable and unexplained period of time under circumstances prejudicial to the adverse party."  *Town of Falmouth* v. *Long*, 578 A.2d 1168, 1170 (Me. 1990).   If this sort of unreasonable and prejudicial delay occurs, a court is free to dismiss the plaintiff's claim.  See *Iglesias* v. *Mutual Life Ins. Co. of New York*, 156 F.3d 237, 243 (1st Cir. 1998).  The City's two-decade delay in bringing suit against Citizens is an egregious instance of laches that merits dismissal of the City's claims.

The City's involvement with the disposal of waste from the Bangor Gas Works dates back to its 1852 order conditioning approval of the plant on the existence of a sewer to the Penobscot River and to the City's 1860 undertaking to construct such a sewer.  See Rec. Dec. at 3, 24-25; SMF ¶¶ 3, 4.  By 1980 the City had begun to investigate the gas works as a possible source of tar-like pollution in the river.  See SMF ¶ 29.  The City also implemented cleanup measures at the former gas works property, completing these efforts in late 1980.  See SMF ¶ 30. All the while, the City made no attempt to contact Citizens, much less initiate legal action.

The present suit was filed on November 22, 2002.  The City has no excuse for the intervening, unreasonable delay from the time it completed cleanup at the former gas works property.  The City simply sat on its rights from late 1980 until 2002, when it finally filed the instant suit.  During most of that period, the City apparently was not engaged in regulatory

processes or any other means of achieving a Penobscot River cleanup. *Cf. Maine People's Alliance* v. *Holtrachem Mfg. Co., L.L.C.*, 2001 WL 1602053 at *3 (D. Me. Dec, 14, 2001) (finding that "oftentimes it is more reasonable to delay court action to ascertain whether the regulatory process will provide a result that satisfies the * * * plaintiff's environmental concerns").

The City's unreasonable delay in bringing this action seriously prejudiced Citizens in several ways. Numerous potential witnesses have died or moved to parts unknown in the more than twenty years since the City first heard complaints about pollution in the Penobscot and started cleaning up the former gas works property. Documents that might have exonerated Citizens or further implicated others in that pollution have been lost or destroyed pursuant to standard document retention policies. The City's disposal of materials once located at the former site of the Gas Works prevented testing that might have excluded the Gas Works as a source of tar in the river. Furthermore, Citizens missed out on any meaningful opportunity to contribute to the City's investigative efforts, and with it the chance to reduce costs that the City now claims as damages. In these ways, the City's unreasonable failure to assert its rights has worked substantial prejudice on Citizens. Accordingly, Citizens asks this Court to dismiss the City's entire Second Amended Complaint as barred by the equitable doctrine of laches.

**B.      The Doctrines of Unclean Hands and Equitable Estoppel Bar The City's Claims.**

The City's complaint blames Citizens and its predecessors for hazardous substances allegedly present in the Penobscot River. But ironically, City Council records from 1852 reveal the City itself ordered the Bangor Gas Light Company to put all "residuum of filth" produced at the company's plant into a "covered drain" that would dump that filth into the Penobscot River. See SMF ¶ 3. The City then undertook to construct a sewer between the Gas Works and the river

in 1860. See Rec. Dec. at 3; SMF ¶ 4. For the next 100 years, the City operated the sewer system in Bangor, "facilitat[ing]" the "hazardous waste disposal of which it now complains" and "designat[ing] the Penobscot River as the appropriate disposal facility." Rec. Dec. at 25. Equity will not permit the City to recover for any damages that resulted from its own policies and practices.

"[O]ne who comes into a court of equity must come with clean hands." *Hamm* v. *Hamm*, 584 A.2d 59, 61 (Me. 1990). In addition, the doctrine of equitable estoppel applies when "the declaration or acts relied upon * * * induced the party seeking to enforce the estoppel to do what resulted to his detriment and what he would not otherwise have done." *City of Auburn* v. *Desgrosseilliers*, 578 A.2d 712, 714 (Me. 1990). "[T]he reliance upon which estoppel is claimed must have been reasonable." *Id.* Importantly, equitable estoppel in Maine applies to both government actors and private parties. See *id.*

In this case, the City comes into court having "facilitate[d]" the pollution for which it is now blaming Citizens. Rec. Dec. at 25. Moreover, the operators of the Gas Works were entitled to rely on the City's 1852 order, as well as the City's construction and maintenance of the sewers, to properly dispose of its wastes. See SMF ¶¶ 3, 4. The fact that the City conditioned the 1852 construction of the Gas Works on the use of a "covered drain" also indicates that the Gas Works operators may have had other plans for their wastes. Finally, more than thirty years after the Gas Works stopped manufacturing gas, the City bought the property adjacent to what it well knew was a polluted portion of the Penobscot River. See SMF ¶ 31. In light of these indisputable facts, the City should be found to have unclean hands and estopped from bringing any claims against Citizens.

**C.** **Citizens Cannot Be Enjoined To Perform Cleanup Activities On Property That Neither Citizens Nor The City Owns.**

The issuance of an injunction is only appropriate "if the party seeking the injunction has sufficient interest or title in the right or property sought to be protected." 42 Am. Jur. 2d § 17; *cf. Levesque* v. *Pelletier*, 68 A.2d 9, 11 (Me. 1949) ("The writ of injunction is, and always has been, granted in Maine with great caution and only when necessary on clear and certain rights."). Each of the City's claims for injunctive relief seeks to require Citizens to cleanup portions of the Penobscot River that do not belong to either Citizens or the City, but rather are property of the state of Maine. For Citizens to effect such a cleanup, it would have to trespass on State-owned parts of the riverbed. Neither the City nor Citizens has the necessary title in that property to sustain the existence of an injunction. Equity will accordingly not permit the City to proceed with any injunctive claims regarding property owned by the state of Maine.

## CONCLUSION

For the reasons discussed, Citizens requests that the Court enter judgment against each of the counts in the City's Second Amended Complaint. Alternatively, Citizens requests that the Court enter judgment against the City's federal-law claims (Counts I-IV and XVII) and dismiss the City's supplemental state-law claims.

Dated at Portland, Maine this 22nd day of March, 2004.

Respectfully submitted,

*/s/ Bruce W. Hepler*
Martha C. Gaythwaite
MGaythwaite@FGWL-Law.com
Bruce W. Hepler
BHepler@FGWL-Law.com
Attorneys for Defendant and Third-Party Plaintiff,

Citizens Communications Company

FRIEDMAN GAYTHWAITE WOLF & LEAVITT
Six City Center, P.O. Box 4726
Portland, ME 04112-4726
(207) 761-0900

Of Counsel:
John S. Hahn
JHahn@MayerBrownRowe.com
Jay C. Johnson
JCJohnson@MayerBrownRowe.com

MAYER, BROWN, ROWE & MAW LLP
1909 K Street, N.W.
Washington, DC 20006-1101
(202) 263-3000

T:

# CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the date shown below, copies of the following document(s):

CITIZENS COMMUNICATIONS COMPANY'S
MOTION FOR SUMMARY JUDGMENT

were electronically filed with the Clerk of Court using the CM/ECF system which will send notification of such filing(s) to the attorney/parties of record who have registered as CM/ECF participants.

Dated at Portland, Maine this 22nd day of March 2004.

Respectfully submitted,


*/s/ Bruce W. Hepler*
Martha C. Gaythwaite
MGaythwaite@FGWL-Law.com
Bruce W. Hepler
BHepler@FGWL-Law.com
Attorneys for Defendant,
Citizen's Communications Company

FRIEDMAN GAYTHWAITE WOLF & LEAVITT
Six City Center, P.O. Box 4726
Portland, ME 04112-4726
(207) 761-0900

AS OF:  March 22, 2004

**1.  BANGOR, MAINE, CITY OF**

WILLIAM B. DEVOE     wdevoe@eatonpeabody.com

W. SCOTT LASETER     slaseter@mckennalong.com

**2.  BARRETT PAVING MATERIALS, INC.**

DAVID B. VAN SLYKE     dvanslyke@preti.com

JOHN P. MCVEIGH     jmcveigh@preti.com,

**3.  BEAZER EAST, INC.**

JEFFREY A. THALER     jthaler@bssn.com  mlibby@bssn.com

**4.  CENTERPOINT ENERGY RESOURCES, INC.**

LAURA M. EARL     learl@jonesday.com

CHARLES T. WEHLAND     ctwehland@jonesday.com

ALBERT D. STURTEVANT     adsturtevant@jonesday.com

DAVID S. SHERMAN     dshermanecf@dwmlaw.com

**5.  CITIZENS COMMUNICATIONS COMPANY**

MARTHA C. GAYTHWAITE     mgaythwaite@fgwl-law.com  aprince@fgwl-law.com
hputterbaugh@fgwl-law.com

BRUCE W. HEPLER     bhepler@fgwl-law.com  gkent@fgwl-law.com

JAY C. JOHNSON     jcjohnson@mayerbrownrowe.com

**6. DEAD RIVER COMPANY**

ROBERT S. FRANK      frank@harveyfrank.com  lduval@harveyfrank.com
kmd@harveyfrank.com

CHARLES A. HARVEY      harvey@harveyfrank.com


**7. GUILFORD TRANSPORTATION INDUSTRIES, INC.**
**8. MAINE CENTRAL RAILROAD COMPANY**

FREDERICK J. BADGER      fbadger@rwlb.com

FREDERICK F. COSTLOW      fcostlow@rwlb.com


**9. HONEYWELL INTERNATIONAL, INC.**

GREGORY A. BIBLER      gbibler@goodwinprocter.com

ROBERT L. BRENNAN      rbrennan@goodwinprocter.com

SEAN MAHONEY      smahoney@verrilldana.com


10. **ROBINSON ET AL**

KEVIN M. CUDDY      kmc@cuddylanham.com  phiggins@cuddylanham.com


**11. UGI UTILITIES, INC.**

 DOUGLAS A. GRAUEL      dgrauel@nkms.com

JAY VARON      jvaron@foleylaw.com


**12. U.S. ARMY CORPS OF ENGINEERS – DEPT. OF JUSTICE**

STEPHEN E. CROWLEY      stephen.crowley@usdoj.gov

MICHELLE T. DELEMARRE      michelle.delemarre@usdoj.gov


Northwestern Growth Corporation – Dismissed
S.E. MacMillan Company, Inc. – Dismissed

39