UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

CITY OF BANGOR,               )
                             )
            Plaintiff,        )
v.                           )
                             )
CITIZENS COMMUNICATIONS      )            Civil No. 02-183-B-S
COMPANY,                     )
                             )
            Defendant        )

**RECOMMENDED DECISION ON
CITIZENS COMMUNICATIONS COMPANY'S
SECOND MOTION FOR SUMMARY JUDGMENT**

The City of Bangor filed suit against Citizens Communications Company seeking to impose liability on Citizens for its alleged part in contributing to the existence of a tar slick on the bottom of the Penobscot River in Dunnett's Cove.[1] Now before the court is Citizens's second summary judgment motion. In the prior round, the court entered partial summary judgment in favor of Citizens, concluding that the City cannot maintain a claim under § 107 of the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), because the City is itself a potentially responsible party (PRP) with respect to the tar slick. (See Order at Docket No. 356, affirming Recommended Decision at Docket No. 291.) In the current round Citizens seeks judgment against all counts remaining in the City's Second Amended Complaint. I recommend that the court grant Citizens's motion in part and deny it in part.

---

[1] Once referred to as Bangor harbor. Now sometimes referred to as the Bangor landing.

## Procedural Background

In connection with Citizens's prior summary judgment motion, the court determined that the City is a potentially responsible party (PRP) in relation to the tar slick in Dunnett's Cove. The underlying assumption that the prior ruling was based on was that the City could prove up its theory of the case, i.e., that Citizens or its predecessors in liability had discharged tar and/or tar-laden wastewater from their former gas plant directly into Dunnett's Cove via a sewer drain connected to the gas plant. However, the prior summary judgment record reflected that the City was complicit in the installation of the subject sewer, having not only affirmatively designated the Penobscot River as the appropriate depository for the gas plant's industrial waste, but having also ordered that a public drain or sewer be laid out to carry the gas plant's waste to the River. In addition, the prior summary judgment record reflected that the City currently owns a piece of property upon which a portion of the tar slick is presently deposited. This evidence, in the court's view, made the City a liable party under CERCLA § 107, 42 U.S.C. § 9607(a)(1), (2) and (3), and effectively prevented the City from taking safe harbor in § 107's third party defense, 42 U.S.C. § 9607(b)(3). Accordingly, the court concluded that the City could not proceed in this litigation as an "innocent plaintiff" entitled to a "full recovery" under CERCLA § 107 as a matter of law. Reserved for another day was the question of whether the City might have available a lesser remedy pursuant to either § 107 or § 113 of CERCLA.

Citizens's current motion for summary judgment seeks to resolve the question reserved from the prior summary judgment proceedings. In addition, Citizens seeks summary judgment against the City's 13 non-CERCLA claims, which include two nuisance claims spread over eight counts (counts V-XII), a claim for strict liability for "ultrahazardous activity" (count XIII), two declaratory judgment claims (counts XIV-XV), a punitive damages claim (count XVI) and, last

but presumably not least, a claim pursuant to the Resource Conservation and Recovery Act (RCRA) (count XVII).

## Statement of Facts

As with all summary judgment motions, the availability of any legal ruling depends on the quality of the parties' factual proffers, which are governed in this District by Local Rule 56. Viewing the Local Rule 56 summary judgment record in the light most favorable to the City, the summary judgment non-movant, and drawing all reasonable inferences in its favor, see Nicolo v. Phillip Morris, Inc., 201 F.3d 29, 33 (1st Cir. 2000), the parties' submissions reveal the following material facts:

The alleged "facility"[2] in this case is an area of tar deposition in Dunnett's Cove of the Penobscot River, including a portion of the Cove's inter-tidal zone. (Docket Nos. 316 & 339, ¶ 2.) In or about 1852, the City approved a petition from the Bangor Gas Works to erect a manufactured gas plant in Bangor and conditioned approval on the Bangor Gas Works's creation of a sewer to carry the gas plant's "residuum of filth" to the Penobscot River. (Id., ¶ 3.) In or about 1860, in answer to a petition submitted by the Bangor Gas Works, the City undertook to assess the need for, lay out a course for, and have constructed a public drain or sewer running from the corner of the property on which the Bangor Gas Works was located to the low water mark in the Penobscot River at Dunnett's Cove. (Id., ¶ 4.) Over the subsequent 110-year period, more or less, the City conducted three "projects" on the sewer situated between the Gas Works and the Penobscot River.[3] (Id., ¶ 8.)

---

[2]     That is, the "site or area where a hazardous substance has . . . come to be located," 42 U.S.C. § 9601(9)(B), and "from which there is a release, or a threatened release which causes the incurrence of response costs," Id., § 9607(a).

[3]     The City strenuously contests that these activities make it a PRP under CERCLA § 107. According to the City, public sewer activities undertaken by the Mayor and Aldermen in the mid-Nineteenth Century were not performed for the City, but as part of a quasi-judicial tribunal acting in agency to the State. In support of this contention the City relies on Keely v. City of Portland, 100 Me. 260, 61 A. 180 (1905) and Atwood v. City of

Sometime between 1995 and the initiation of this lawsuit,[4] the City acquired a parcel of land fronting on Dunnett's Cove in the Penobscot River ("the Riverfront Property").  (Id., ¶ 1.) At the time of the acquisition, the City was aware of tar-like contamination in Dunnett's Cove and had been for approximately 15 years.  (Id., ¶¶ 29-30.)  The City was also aware at that time of potentially related environmental issues with the Riverfront Property.  (Id., ¶ 31.)  Pursuant to a Release Deed for the Riverfront Property, the City "assume[d] any and all . . . liabilities" with

---

Biddeford, 99 Me. 78, 58 A. 417 (Me. 1904).  Although this argument was raised in connection with the prior summary judgment proceedings, I have not commented on it previously.  Keely and Atwood stand for the proposition that a Maine municipality could not be held liable in a tort action by a private citizen based on decisions respecting the placement or design of public sewers because the authority to make such determinations was vested by statute in the municipal officers or in a committee chosen by the municipality, which officers or committee constituted "an entirely distinct tribunal" from the municipality in its "corporate capacity."  Atwood, 99 Me. at 79-80, 58 A. at 418.  Thus, in Atwood the plaintiff asserted "an action in tort" against the City of Biddeford in its corporate capacity, alleging that the City "without lawful authority" (i.e., without following the proper statutory procedure to establish a public sewer) constructed a public sewer that emptied into a brook on the plaintiff's property and created a private nuisance.  The Court sustained the City's demurrer to the action and held that the action could not be maintained because the sewer could only have been lawfully constructed by the municipal officers of the City, who in doing so "act not as agents of the town but as public officers, deriving their power from the sovereign authority."  Id., 99 Me. at 81, 58 A. at 418 (quoting Bulger v. Eden, 82 Me. 352, 356, 19 A. 829, 830 (1890)).

I do not believe that these authorities require this court to pretend, for purposes of determining whether the City is a PRP under CERCLA, that the acts engaged in by the City's duly authorized corporate officers were not really acts of the City's duly authorized corporate officers.  In my assessment, these cases merely reflect the gradual accretion of common law "governmental immunity" for Maine municipalities over the course of the prior two centuries, which came to an end with Davies v. City of Bath, 364 A.2d 1269, 1272-73 (Me. 1976) ("No purpose would be served here by restating our reasons for holding that governmental immunity is no longer a rational judicial doctrine. . . . .  Throughout the United States, the doctrine has been so discredited that an overwhelming majority of jurisdictions has abolished it either by judicial decision or by statute.  When the conditions of society change to such an extent that past judicial doctrines no longer fulfill the needs of a just and efficient system of law, we should not be bound by the constraints of stare decisis.") (citation and footnote omitted), which, coincidentally, also involved municipal liability for sewer-related activities.  Id. at 1269.  Indeed, Keely and Atwood essentially hold only that certain municipal acts cannot be the basis for common law tort liability (e.g., "quasi-judicial" or "governmental" determinations about the placement of sewers), while other municipal acts can (e.g., "ministerial" or "proprietary" acts pertaining to sewer maintenance).  They do not hold that so-called "governmental" or "quasi-judicial" acts undertaken by a municipality in the heyday of common law municipal immunity must forevermore be treated as acts undertaken by someone or something other than the municipality.  See Bale v. Ryder, 286 A.2d 344, 345-47 (Me. 1972) (criticizing the illogic in the common law distinctions between "governmental" versus "proprietary" functions).  In my view, these early cases on the scope of municipal liability under state tort law for sewer activities do not require this Court to insert a dishonored common law fiction into its CERCLA analysis to find that authorized acts carried out by the City's officers were not really the acts of the City itself.

[4]    Presumably in 1996, although the record material cited by Citizens does not provide good evidence of the date of the transaction.

respect to, among other things, "underground facilities" and "drainage culverts" located on the Riverfront Property.  (Id., ¶ 33.)[5]

Subsequent to the City's acquisition of the Riverfront Property, the City and the State of Maine, including the Maine Department of Environmental Protection (DEP), entered into a Memorandum of Agreement (MOA) to share the expense and jointly oversee and participate in an investigation of the environmental impact that the former gas works had upon the Penobscot River in Dunnett's Cove, including an "Ecological Risk Assessment," "Human Risk Assessment" and "Archeological Survey," the establishment of "Target Cleanup Levels" based on the same, and a "Feasibility Study . . . to assess remediation options concerning the tar deposit."  (Id., ¶¶ 22-23.)  Pursuant to the MOA, DEP promised to "conduct or contract for the performance of the Archeological Survey, the establishment of Target Cleanup Levels and the selection of one or more remedial options."  (Id., ¶ 24.)  As of the present date, DEP has designated the site as an Uncontrolled Hazardous Substance Site pursuant to 38 M.R.S.A. § 1364.  (Id., ¶ 27.)  As of the present date, the City has incurred response costs related to site investigation and planning for future site remediation.  It has not commenced a cleanup.

## Discussion

Citizens's motion for summary judgment is comprehensive, addressing every claim asserted in the City's second amended complaint.  I address the challenges to the City's federal claims first before turning to the state law claims.  My assessment is that summary judgment

---

[5]     At oral argument, the City maintained that although it was aware of the tar slick in the River and of contaminated soil at the riverfront property, at the time it acquired the riverfront property it was not yet aware of any connection between the tar slick and the gas plant.  It does not appear that this assertion was set forth in the City's statements of material fact for the pending motion or for the prior motion, or that any record evidence presently exists to support this contention.  In any event, even if it were true, whether the City had knowledge of gas plant waste on the premises could only have relevance to the City's nuisance claims;  it would not impact the viability of the CERCLA § 107 claim for "full recovery," which has already been disposed of.  Regardless of the City's state of mind at the time it acquired the riverfront property, the record establishes that the City is not innocent in relation to the tar slick, which did not arise solely as a result of an act or omission by a third party.

should be denied as to both federal claims and the state law public nuisance claims, but should be granted as to all other state law claims.

## I. Federal Claims

### A. CERCLA

The primary dispute that is presented in the pending summary judgment motion concerns whether the City can maintain any CERCLA action against Citizens in light of the court's previous finding that the City is a PRP with respect to the tar slick facility and the procedural fact that the City's action does not grow out of a preexisting federal or state enforcement action. According to Citizens, CERCLA § 113 precludes the City's action because it was not instituted "during or following any civil action under [CERCLA] section 9606 . . . or 9607(a)," 42 U.S.C. § 9613(f)(1),[6] and common law principles preclude the maintenance of a "contribution" action when the contribution plaintiff has not extinguished the contribution defendant's liability while subject to some manner of legal compulsion. (Docket No. 315 at 7-8.) These contentions parrot the legal conclusions drawn by the District Court for the District of New Jersey in E.I. Du Pont De Nemours and Company v. United States, 297 F. Supp. 2d 740 (D. N.J. 2004). For its part, the City relies on the Fifth Circuit opinion in Aviall Services, Inc. v. Cooper Industries, Inc., 312 F.3d 677 (5th Cir. 2002), cert. granted, 157 L. Ed. 2d 811, 124 S. Ct. 981 (2004), and on the

---

[6]    I set out the relevant language of § 113(f) here for ease of reference.

(f) Contribution.
  (1) Contribution.  Any person may seek contribution from any other person who is liable or potentially liable under section 107(a) [42 USCS § 9607(a)], during or following any civil action under section 106 [42 USCS § 9606] or under section 107(a) [42 USCS § 9607(a)].  Such claims shall be brought in accordance with this section and the Federal Rules of Civil Procedure, and shall be governed by Federal law.  In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate.  Nothing in this subsection shall diminish the right of any person to bring an action for contribution in the absence of a civil action under section 106 or section 107 [42 USCS § 9606 or 9607].

42 U.S.C. § 4613(f).

Ninth Circuit opinion in <u>Western Properties Service Corporation v. Shell Oil Company</u>, 358 F.3d 678 (9th Cir. 2004). (Docket No. 338 at 14-17.)

In <u>Aviall</u>, the Fifth Circuit addressed the question of "whether § 113(f)(1) of [CERCLA] allows a [PRP] to seek contribution from other PRPs for environmental cleanup costs when no civil action has been brought under CERCLA §§ 106 or 107(a)." 312 F.3d at 679. The court held that § 113(f) did allow contribution suits by one PRP against another in the absence of a preexisting civil action against the plaintiff. <u>Id.</u> Recognizing the "confused syntax" of § 113(f), the court concluded that, in light of CERCLA's purpose to promote "prompt and effective cleanup of hazardous waste sites and the sharing of financial responsibility among the parties whose actions created the hazards," <u>id.</u> at 681-82, CERCLA's imposition of joint and several liability among all PRPs, <u>id.</u> at 681, the desirability of having available a contribution remedy to ensure cost allocation among PRPs and, thus, actual clean ups, <u>id.</u> at 682, the availability of equitable contribution actions by PRPs prior to the enactment of § 113(f) and the "decisional background" against which Congress passed § 113(f), <u>id.</u> at 682-83, and the legislative history related to its passage, <u>id.</u> at 683-85, the appropriate reading of § 113(f)'s opening sentence is one that is permissive rather than restrictive and that the appropriate reading of the savings clause is one that saves the preexisting federal case law that had recognized equitable contribution claims by PRPs in the absence of preexisting actions against them, <u>id.</u> at 686-87. Similarly, in <u>Western Properties Service Corporation v. Shell Oil Company</u>, the Ninth Circuit issued an opinion "consistent" with <u>Aviall</u>, holding that the language of the so-called "savings clause" reflects that a court ought not "read[] into the first sentence a restrictive 'only' before 'during or following,' and that contribution can be sought before a § 106 or a § 107(a) judgment." 358 F.3d at 684. <u>See also</u> <u>City of Waukesha v. Viacom, Inc.</u>, 221 F. Supp. 2d 975, 977 (E.D. Wis. 2002)

(permitting § 113 action to go forward while municipal plaintiff is in the process of investigating and cleaning up the site).

Precedent in this Circuit makes the application of these various cases somewhat problematic. The First Circuit has indicated that it must interpret the term contribution in accordance with its traditional legal meaning. United Tech. Corp. v. Browning-Ferris Indus., Inc., 33 F.3d 96, 99 (1st Cir. 1994).[7] It may be that the First Circuit sitting en banc would eschew this reading, but as matters now stand, a CERCLA "contribution" action "refers to a claim by and between jointly and severally liable parties for an appropriate division of the payment one of them has been compelled to make." Id. at 99 (internal quotation marks and citation omitted, emphasis added). On the other hand, the First Circuit has not yet had occasion to interpret § 113's savings clause, which might serve as an independent basis for preserving the City's "contribution" action despite the fact that the City incurred response costs voluntarily. See 42 U.S.C. § 9613(f) ("Nothing in this subsection shall diminish the right of any person to bring an action for contribution in the absence of a civil action under section 9606 of this title or section 9607 of this title."). In a rather cryptic footnote in United Technologies, the First Circuit

_____

[7]    One of the more perplexing aspects of requiring a preexisting enforcement action before allowing a PRP plaintiff to proceed under § 113 is that it does not harmonize with the fact that an innocent plaintiff who voluntarily incurs response costs is permitted to seek a full recovery under § 107 despite the absence of any preexisting enforcement action. See 42 U.S.C. § 9607(a)(4)(B). Whether a private CERCLA plaintiff is innocent or partially responsible for hazardous waste releases, it incurs response costs to clean up its land in furtherance of its own economic and/or social interests. Furthermore, whether the plaintiff is innocent or responsible, permitting these claims to go forward serves the overriding goal of effectuating cleanups and pooling the financial resources of multiple parties. Thus, it is hard to understand why an innocent plaintiff should have ready access to a full recovery under § 107, whereas a PRP plaintiff should be denied even a partial, equitable recovery, simply because the United States or a state is not formally occupying the role of primary plaintiff (particularly in this case, where the State is assisting with and overseeing the City's remedial efforts). This is especially true in light of CERCLA's broad definition of a PRP, crafted in a way that creates a potential for liability from many contributors, including those with only a proportionally small share of the responsibility. What happens in a so-called "innocent party" case when the sole defendant sued tries to bring its third party action? Do those third-parties say that because the primary plaintiff was not the United States or a state the defendant has not extinguished all potential liability? Is that the only situation where the so-called "savings clause" serves any purpose? I do not pretend to know the definitive answers to these questions and I do not think anyone will until perhaps the Supreme Court issues its decision in Aviall. In the context of the many anomalies presented by this particular case, I have crafted what I consider to be the appropriate resolution of these issues.

indicated that the law may allow an implied right of action for what I would call "contribution without compulsion" or "equitable recoupment," which the court also seemed to suggest might fall under either the § 107 or the § 113(f) rubric, at least to the extent of determining the appropriate limitation period. 33 F.3d at 99 n.8. In light of this these rather confused signposts, my recommendation is that the court allow the City to proceed with its so-called "contribution" claim, without attempting to formally pinpoint whether it is most appropriately pigeonholed under counts I and II (§ 107) or counts III and IV (§ 113(f)).[8]

As a fallback argument, Citizens maintains that even if its motion for summary judgment is not granted, the court should "enter a judgment declaring that Citizens shall not be held liable for any cleanup costs unless the City proves those costs resulted from releases from the Gas Works caused by Citizens and that neither the City nor any third party is equitably responsible for such releases." (Docket No. 315 at 9-11.) In support of this proposition Citizens cites Centerior Service Company v. Acme Scrap Iron & Metal Corporation, in which the Sixth Circuit Court of Appeals stated, "In actions seeking contribution, unlike those for joint and several cost recovery, the burden is placed on the plaintiff to establish the defendant's equitable share of response costs." 153 F.3d 344, 348 (6th Cir. 1998). This argument has nothing to do with Citizens's liability. See Kalamazoo River Study Group v. Menasha Corp., 228 F.3d 648, 656 (6th Cir. 2000) ("The liability standard for contribution claims is the same as the `standard for cost recovery claims," and "consideration of causation is proper only in allocating response costs,

_____

[8]     The authorities cited by the United Technologies Court suggest that any such claim could fall under § 107(a)(4)(B), not § 113(f). See Key Tronic Corp. v. United States, 511 U.S. 809, 816 (1994) (discussing the 1986 amendment of CERCLA and stating that "the statute now expressly authorizes a cause of action for contribution in § 113 and impliedly authorizes a similar and somewhat overlapping remedy in § 107"); In re Hemingway Transp., Inc., 993 F.2d 915, 931 (1st Cir.), cert. denied, 510 U.S. 914 (1993) ("Unlike section 9613(f), a private right of action for CERCLA response costs under section 9607(a)(4)(B) is available to 'any person' who incurs necessary response costs, presumably without regard to whether the plaintiff is an EPA target, i.e., a PRP or 'covered person' under section 9607(a).").

not in determining liability.")[9]; <u>Minyard Enters., Inc. v. Southeastern Chem. & Solvent Co.</u>, 184 F.3d 373, 386 (4th Cir. 1999) ("The Plaintiffs are entitled to contribution from [the defendant] for Response Costs pursuant to § 113(f) of CERCLA if they pleaded and proved allegations supporting that they, as well as [the defendant], are responsible parties under § 107(a) of CERCLA.").  Rather, Citizens hopes that the court will cabin its considerable equitable discretion to allocate response costs before all the evidence has come in.  Although precedent indicates that the burden falls on the City to prove Citizens's equitable share in response costs, <u>Centerior</u>, 153 F.3d at 348; <u>Minyard Enters.</u>, 184 F.3d at 385, that does not necessarily mean that Citizens must disprove liability on the part of every conceivable third-party PRP.  Nor does it necessarily mean that Citizens cannot be allocated a share of response costs for releases that more than one party is liable for.  In other words, the fact that more than one entity may be liable for a given release does not mean that response costs cannot be equitably allocated disproportionately to one of them.[10]  Assuming that Citizens's liability can be established,

---

[9]    In <u>Kalamazoo</u>, the Sixth Circuit discussed the First Circuit's opinion in <u>Acushnet Company v. Mohasco Corporation</u>, in which the First Circuit affirmed a summary judgment for a § 113 defendant where "the record was insufficient to permit a meaningful equitable allocation of remediation costs."  191 F.3d 69, 71 (1st Cir. 1999).  That dispositive ruling was premised on a factual finding that the defendant's contribution to contamination was <u>de minimus</u>.  <u>Id.</u> at 77 (holding "that a defendant may avoid . . . liability for response costs in a contribution action under § 9613(f) if it demonstrates that its share of hazardous waste deposited at the site constitutes no more than background amounts of such substances in the environment and cannot concentrate with other wastes to produce higher amounts").  The instant motion does not press the issue addressed in <u>Acushnet</u> and, even if it did, there remains a genuine issue of material fact what Citizens's contribution to the tar slick was.

[10]   By way of example, Citizens would argue that although it may have succeeded to the liabilities of the former gas plant business, as the last owner and operator of the plant, any response costs occasioned by releases made prior to Citizens's ownership of the plant could not be allocated to it because the City and/or the former parents of the Bangor Gas Works or Bangor Gas Light Company's stock are also liable in connection with those releases.  This assertion opens a can of worms that the summary judgment papers are not designed to address.  A corporate parent is not automatically liable for releases made by its subsidiary unless the parent would have been derivatively liable through veil piercing or directly liable for operating its subsidiary's facility.  <u>United States v. Bestfoods</u>, 524 U.S. 51 (1998).  Furthermore, even if the law indicates that the City shares § 107 liability for the gas plant's releases due to its historical sewer activities, that does not mean it is equitable to preclude the City from recovering any of its response costs.  Among other factors the Court might consider in allocating responsibility is the fact that the operators of the gas plant had the ultimate control over the intensity and frequency of any hazardous waste releases.  Finally, it is not necessarily even the case that Citizens's share in response costs have to be tied to specific releases from the gas plant.  So-called "orphan shares" can be allocated among the available PRPs.  <u>See</u> <u>Pinal Creek Group</u>, 118 F.3d at 1303, <u>cert. denied</u>, 524 U.S. 937.

precedent indicates that any future allocation of costs will depend on a broad array of equitable factors. See W. Props. Serv. Co., 358 F.3d at 693; Minyard Enters., 184 F.3d at 385; Pinal Creek Group v. Newmont Mining Corp., 118 F.3d 1298, 1303 n.4 (9th Cir. 1997), cert. denied, 524 U.S. 937 (1998). I recommend that the court deny Citizens's summary judgment motion with respect to the CERCLA § 113 claim. The court should not prejudge the scope of its equitable power to allocate response costs depending on the facts presented to it. Nor should it issue an advisory opinion about burdens of proof respecting third-party contribution to the tar slick.

**B.    RCRA**

In addition to its CERCLA claims, the City also advances a claim under the Resource Conservation and Recovery Act, 42 U.S.C. § 6972(a)(1)(B). (Docket No. 175, Count XVII.) Pursuant to 42 U.S.C. § 6972(a)(1)(B) of the Resource Conservation and Recovery Act (RCRA), any person may commence a "citizens suit":

> Against any person, . . . including any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment.

Count XVII of the City's Second Amended Complaint fits squarely within this category. However, in its plea the City requests, among other things, a judgment that Citizens pay all of the City's costs in connection with its response to the tar slick. (Docket No. 175 at 32.) Citizens asks that judgment enter against this aspect of the City's RCRA claim because money damages are not available in a RCRA citizen suit. (Docket No. 315 at 11, 14-15.) The City concedes that it may not recover past or future money damages under RCRA. (Docket No. 338 at 2.) I nevertheless address the issue briefly to make it clear that the court may still have the power to

impose financial burdens on Citizens as part of an equitable remedy, should it determine to exercise its discretion in that fashion.

RCRA § 6972(a) empowers this court "to restrain any person who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste [and/or] to order such person to take such other action as may be necessary." 42 U.S.C. § 6972(a). RCRA is not designed "to compensate those who have attended to the remediation of environmental hazards." Meghrig v. KFC W., Inc., 516 U.S. 479, 483 (1996). Rather, RCRA's primary purpose "is to reduce the generation of hazardous waste and to ensure the proper treatment, storage, and disposal of that waste which is nonetheless generated, 'so as to minimize the present and future threat to human health and the environment.'" Id. (quoting 42 U.S.C. § 6902(b)). In Meghrig, the Supreme Court squarely held that plaintiffs may not use RCRA to obtain "compensation for past cleanup efforts" or "an award of past cleanup costs." Id. at 484. However, the Supreme Court expressly reserved the question of whether a court might impose injunctive relief that requires a responsible party to help pay for future measures that are responsive to hazardous waste contamination. Id. at 488.[11] Since Meghrig, district courts appear to have held almost universally that RCRA does not afford a recoupment or restitutionary remedy for costs incurred after the commencement of litigation, either. See Davenport v. Neely, 7 F. Supp. 2d 1219, 1229 (M.D. Ala. 1998); Andritz Sprout-Bauer v. Beazer East, 174 F.R.D. 609, 618 (M.D. Penn. 1997); Express Car Wash Corp. v.

---

[11] In the Supreme Court's words:

Without considering whether a private party could seek to obtain an injunction requiring another party to pay cleanup costs which arise after a RCRA citizen suit has been properly commenced, cf. United States v. Price, 688 F.2d 204, 211-213 (CA3 1982) (requiring funding of a diagnostic study is an appropriate form of relief in a suit brought by the Administrator under § 6973), or otherwise recover cleanup costs paid out after the invocation of RCRA's statutory process, we agree . . . that a private party cannot recover the cost of a past cleanup effort under RCRA.

Meghrig, 516 U.S. at 488.

Irinaga Bros., 967 F. Supp. 1188, 1193-94 (D. Ore. 1997); Eastman v. Brunswick Coal & Lumber Co., 1996 WL 911200, *9-*10, 1996 U.S. Dist. LEXIS 22108, *23-*26 (D. Me. Apr. 19, 1996) (recommended decision on motion to dismiss).  The primary rationale is that RCRA is not a cost recovery scheme.  The Seventh Circuit Court of Appeals takes a similar view, but expressly draws the line at the entry of judgment.  Albany Bank & Trust Co. v. Exxon Mobil Corp., 310 F.3d 969, 974 (7th Cir. 2002) ("This court has understood Meghrig also to bar a plaintiff from recovering cleanup costs incurred after filing suit but prior to the entry of final judgment.")  Like the Supreme Court, the Seventh Circuit holds out the possibility that a court might, as part of its final judgment, impose upon those who have contributed to the creation of an imminent and substantial endangerment to health or the environment, financial obligations in connection with post-judgment response or remediation rather than, or in addition to, specific and independent cleanup obligations.  Id.  My assessment is that summary judgment should enter against count XVII to the extent that it might be read as seeking the "recovery" of the City's past and allegedly ongoing response costs or other forms of "damages,"[12] but that the court should retain its authority to impose financial burdens on Citizens in connection with any eventual removal or remedial action that might be ordered.  Such a remedy would not entail cost recovery or damages, but rather affirmative obligations to attend to the removal or remediation of the tar deposited at the Dunnett's Cove site.

Despite the availability of an injunctive remedy under RCRA, Citizens also maintains that the City's RCRA claim cannot proceed because the State of Maine "is diligently proceeding with a remedial action at the site."  (Docket No. 315 at 11-14.)  Pursuant to RCRA § 6972(b)(2)(B), a action of the kind presented here cannot be "commenced":

---

[12]     The City's plea does not limit itself to "recovery" of costs, but asks that Citizens be ordered "to pay all future response costs."

"if the Administrator [of the Environmental Protection Agency], in order to . . . abate . . . conditions which may have contributed or are contributing to the activities which may present the alleged endangerment—

(i) has commenced and is diligently prosecuting an action under section 7003 of this Act [42 USCS § 6973] or under section 106 of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 [42 USCS § 9606],[;]

(ii) is actually engaging in a removal action under section 104 of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 [42 USCS § 9604];

(iii) has incurred costs to initiate a Remedial Investigation and Feasibility Study under section 104 of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 [42 USCS § 9604] and is diligently proceeding with a remedial action under that Act [42 USCS §§ 9601 et seq.]; or

(iv) has obtained a court order (including a consent decree) or issued an administrative order under section 106 of the Comprehensive Environmental Response, Compensation and Liability Act of 980 [1980] [42 USCS § 9606], or section 7003 of this Act [42 USCS § 6973] pursuant to which a responsible party is diligently conducting a removal action, Remedial Investigation and Feasibility Study (RIFS), or proceeding with a remedial action.

42 U.S.C. § 6972(b)(2)(B).  The Supreme Court has read this provision as barring an action under circumstances where either the Administrator or the state has undertaken one of the foregoing actions.  Meghrig, 516 U.S. at 486 ("[N]o citizen suit can proceed if either the EPA or the State has commenced, and is diligently prosecuting, a separate enforcement action."). Citizens hangs its hat on subsection (iii) (see Docket No. 315 at 12), which requires the incurrence of costs to initiate a remedial investigation and feasibility study under CERCLA § 104 and diligent prosecution of a CERCLA remedial action.  42 U.S.C. § 6972(b)(2)(B)(iii). According to Citizens, the State of Maine is diligently proceeding with a remedial CERCLA action because it has helped finance site investigation and feasibility studies and has designated the Dunnett's Cove site as an uncontrolled hazardous substances site pursuant to state law. Citizens also highlights the difference between the language of subsection (ii) and (iii) of §

6972(b)(2)(B). While the former speaks of "actually engaging in a removal action," the latter speaks only of "diligently proceeding with a remedial action." (Docket No. 315 at 13.)[13] I cannot conclude that the State's financial assistance with site investigation and planning pursuant to the City and State's Memorandum of Agreement rises to the level of CERCLA § 104 action, particularly where that document appears to anticipate the instant suit, or that its designation of the site as an uncontrolled hazardous substances site pursuant to Maine law and administrative procedures rises to the level of diligent prosecution of a CERCLA remedial action, particularly where the evidence does not suggest that the State has done anything to compel anyone to remediate the Dunnett's Cove site pursuant to any authority arising out of CERCLA. See, e.g., Orange Environment, Inc. v. County of Orange, 860 F. Supp. 1003 (S.D. N.Y. 1994) (finding that RCRA's statutory bar to citizen suit does not apply when state involvement consists only of state administrative action); cf. Murray v. Bath Iron Works Corp., 867 F. Supp. 33, 41 (D. ME. 1994) (making the same finding in relation to identical language in § 6972(b)(2)(C)(iii)); Davies v. Nat'l Coop. Refinery Ass'n, 1996 WL 529208, *4-*5, 1996 U.S. Dist. LEXIS 10122, *13-*15 (D. Kan. July 12, 1996) (same). In any event, the designation of the site occurred after the City had commenced this suit. (Docket No. 316, Ex. 37, draft designation dated 2003.) Title 42 U.S.C. § 6972(b)(2)(B) bars only the commencement of actions, not the maintenance of actions already commenced. Finally, at the very least there is a genuine issue of material fact whether the State is "diligently proceeding with a remedial action" and, accordingly, the RCRA claim should go forward.

---

[13] The distinction probably relates more to the difference between "removal" and "remedial action." Removal means what it says: cleanup or removal of hazardous waste. 42 U.S.C. § 9601(23). Remedial action refers to alternative permanent solutions. Id., § 9601(24). None of the statutory examples of remedial action concern preliminary measures like remedial investigations or feasibility studies.

## II.    State Law Claims

The City's second amended complaint (Docket No. 175) recites four statutory public nuisance claims (counts V-VIII), one statutory private nuisance claim (count IX), two common law public nuisance claims (counts X-XI), one common law private nuisance claim (count XII), a common law strict liability/ultra-hazardous activity claim (count XIII), a declaratory judgment claim pertaining to all of its common law claims (count XIV), a declaratory judgment claim pertaining to all of its statutory nuisance claims (count XV) and a punitive damages claim (count XVI).  There is no question that the City's claims could have been adequately set forth in half as many counts.

### A.    Nuisance

Citizens complains that the City's statutory nuisance counts VI though IX ought to be dismissed because, like count V, they all arise out of the same statutory provision, 17 M.R.S.A. § 2701, which authorizes actions for damages caused by nuisance.  It does appear that these five counts could readily have been recited as one count with multiple pleas for relief, perhaps under a caption such as "statutory nuisance, 17 M.R.S.A. §§ 2701, 2702, 2802," and that the court might dismiss counts VI through IX and incorporate their pleas and statutory references into count V, but this would likely only confuse matters more.  In my view, it is better to just address the merits of these counts.

### 1.    *Judgment should enter against the private nuisance claims.*

According to Citizens, private nuisance suits cannot be maintained without proof that the defendant intends to interfere with the plaintiff's use of property and in fact does unreasonably interfere with the plaintiff's use.  (Docket No. 315 at 19.)  Citizens also argues that private

nuisance claims are meant to involve claims between contemporaneous and adjacent landowners, not claims by non-adjacent landowners who do not contemporaneously hold title to their respective parcels. (Docket No. 315 at 20-21.) Additionally, Citizens contends that the City cannot maintain a private nuisance suit because it came to the nuisance, knowing that it was present.[14] (Id. at 21.)

One element of the private nuisance cause of action is that the defendant must have "acted with the intent of interfering with the use and enjoyment of the land by those entitled to that use." Charlton v. Town of Oxford, 2001 ME 104, ¶ 36, 774 A.2d 366, 377 (quoting W. Page Keeton et al., Prosser And Keeton on The Law of Torts § 87 at 622-23 (5th ed. 1984)). None of the evidence that the City references in its opposition memorandum to establish intent was incorporated into a statement of additional material facts. (Docket No. 338 at 25, n.27.) Rather, the City simply appended a laundry list of exhibits to its responsive memorandum. This is a blatant violation of Local Rule 56. Moreover, even if this evidence were properly before the court, it consists of publications by the American Gas Association in 1919 and 1920, which do not establish intent, or even knowledge,[15] on the part of Citizens or its predecessors at the gas plant that the discharge of waste into the Penobscot River would result in a tar slick that would cause harm to riparian use of the subject property, which the record suggests was used for

---

[14]     Citizens also argues that a private nuisance action must lie between adjacent landowners. (Docket No. 315 at 19-20.) However, cases involving riparian nuisances suggest that "adjacent" takes on an expanded meaning and that downstream riparian proprietors may maintain nuisance claims. See, e.g., Smedberg v. Moxie Dam Co., 92 A.2d 606, 608, 148 Me. 302, 306 (1952), Kennebunk, Kennebunkport & Wells Water Dist. v. Maine Turnpike Authority, 84 A.2d 433, 439, 147 Me. 149, 160 (1951). Although these cases appear most often to involve public nuisances, insofar as navigable waterways are open to the public, private proprietors have been able to pursue nuisance claims so long as they establish a particularized private injury despite being non-adjacent to the defendant. See Smedberg, 92 A.2d at 608, 148 Me. at 306 (collecting cases).

[15]     See Charlton, 2001 ME 104, 774 A.2d at 377 n.11 (indicating that the intent element would be satisfied with proof "that the defendant has created or continued the condition causing the interference with full knowledge that the harm to the plaintiff's interests are occurring or are substantially certain to follow," quoting W. Page Keeton et al., Prosser And Keeton On The Law Of Torts § 87 at 624-25 (5th ed. 1984)).

railroad purposes (including a wharf) throughout the gas plant's history.[16]  Furthermore, to the

extent that the City should make riparian use of its riverfront property, it would do so either for

purposes of public access or public service.  Because harm to the City's riparian use is harm to

the public's riparian use, the City's nuisance action is inherently in the nature of a public

nuisance, just as though the City were seeking to remove an obstacle to the public's use of, or

access to, a public road or other right of way.  See, generally, Restatement (Second) of Torts

§ 821B cmts. a, g (discussing the history and nature of public nuisances).  Finally, maintenance

of a public nuisance claim affords the City the full panoply of remedies that would be available

under a private nuisance theory.  In light of the lack of evidence of Citizens's intent to harm the

City's prospective riparian use, the fact that the alleged nuisance is public in nature, and the fact

that the City's use of the property would constitute public use, I recommend that the court grant

summary judgment against the City's so-called private nuisance claims (counts IX and XII).[17]

> 2.      *The public nuisance claims should proceed.*

Citizens contends that the City cannot maintain an action for public nuisance because it

has not suffered any "special and peculiar damages."  (Docket No. 315 at 18.)  The requirement

that public nuisance plaintiffs be able to establish special and peculiar damages not felt by the

general public appears to be a prudential limitation on the ability of private individuals to

maintain public nuisance actions.  See Charlton, 2001 ME 104, 774 A.2d at 371-376.  The City is

---

[16]       The City suggested during oral argument that intent is not an element of a statutory private nuisance claim, only a common law private nuisance claim.  However, it would seem that in seeking to understand the distinction the Legislature drew between private and public nuisances, both of which are named in 17 M.R.S.A. § 2701 but neither of which are defined, the Law Court would necessarily look to the common law, which affords the only explanation for the distinction.  See Myrick v. James, 444 A.2d 987, 1007 (Me. 1982) ("If a term or expression as used in a statute have already been given a legal meaning by the courts, it is presumed that the Legislature attached the same meaning to them when used on a subsequent occasion.").

[17]       I have avoided basing my recommendation on Citizens's "coming to the nuisance" argument.  Although it has a certain amount of appeal, the Restatement reflects that coming to the nuisance is not necessarily a bar to a nuisance action.  See Restatement (Second) of Torts § 840D.   It is the generally accepted rule that a "defendant is required to contemplate and expect the possibility that the adjoining land may be settled, sold or otherwise transferred and that a condition originally harmless may result in an actionable nuisance when there is later development."  Id. cmt. b.

not a private individual and, therefore, prudence does not call for the rule's application in this case.[18]  See Restatement (Second) of Torts, § 821C, cmt. j ("A public official who is authorized to represent the state or an appropriate subdivision in an action to abate or enjoin a public nuisance may of course maintain the action.").  At oral argument, Citizens argued that only the State could maintain a public nuisance claim with respect to contamination in the River because only the State has a sufficient ownership interest in the River.  Citizens did not cite any authorities in support of this proposition.  My review of the Restatement sections and the cases cited herein suggests to me that municipalities have historically served as surrogates for the sovereign where public nuisances have been concerned.  Whether this issue has any traction for Citizens is unclear to me at this juncture, but because the City certainly has standing to press a public nuisance claim with respect to all or a portion of the inter-tidal zone of the riverfront property, which the City does own and which it allows the public a right of access to, this argument does not appear to warrant entry of summary judgment.  Accordingly, I recommend that the court reject Citizens's suggestion that the City lacks "standing" to pursue the public nuisance claims.[19]

---

[18]     In addition to Charlton, Citizens also cites Hanlin Group, Inc. v. International Minerals & Chemical Corporation, 759 F. Supp. 925 (D. Me. 1990).  (Docket No. 315 at 18.)  In Hanlin, this Court concluded, inter alia, that the plaintiff did not suffer a sufficiently particularized injury from the defendant's discharge of mercury and other contaminants into the Penobscot River because the plaintiff was a private corporation complaining of injuries unrelated to its exercise of a public right.  Id. at 935-37.  The City, of course, exercises public rights and Hanlin is, therefore, not on point.

[19]     Another argument first raised by Citizens at oral argument is that the public nuisance claim cannot provide the City with meaningful relief under the circumstances of the case because, essentially, it would be inconceivable to think that a state court of general jurisdiction might fashion, in the absence of a federal RCRA action, a suitable removal plan that would force the defendant to clean up contamination of this sort.  I certainly acknowledge that the prospect of crafting an appropriate injunctive remedy in this case is daunting, but I am not convinced that the common law or the statutory cause of action for public nuisance would be so hopelessly ineffectual that summary judgment ought to enter, particularly given the informal way in which Citizens has raised the issue.  Certainly the law of nuisance contemplates injunctive relief requiring the defendant to remove the nuisance.  See 17 M.R.S.A. § 2702 (authorizing an order that "the nuisance [be] removed at the expense of the defendant"); Jacques v. Pioneer Plastics, 676 A.2d 504, 508 (1996) ("We see no reason why our long-standing rule of what constitutes a continuing nuisance or trespass should contain an exception for environmental waste.  Our rule without such an exception encourages abatement by the responsible party, an important public policy consideration.  In contrast, if we were to exclude from this test environmental contamination cases the effect would be to grant defendants the equivalent of

**B.    Strict Liability**

In Count XIII the City asserts a common law strict liability claim based on the theory that operation of the Gas Works and disposal of the associated wastes were abnormally dangerous activities.  (Docket No. 175.)  Citizens contends that the Law Court has rejected the doctrine of strict liability in tort for ultra-hazardous activities, that the common law does not support an application of strict liability to waste disposal activities generally and that the statute of limitation bars this claim.  (Docket No. 315 at 24-30.)  The City responds that this court has denied defendants summary judgment on comparable facts in three prior instances.  (Docket No. 338 at 28-30.)

The cases discussed by the parties are Reynolds v. W. H. Hinman Company, 145 Me. 343, 75 A.2d 802 (1950) (granting defendant's demurrer against a strict liability claim where damage to the plaintiffs' property was allegedly caused by the use of dynamite to blast rock), Lefebvre v. Central Maine Power Company, 7 F. Supp. 2d 64, 72-73 & n.6 (D. Me. 1998) (denying summary judgment to defendant where plaintiff sought to impose strict liability for disposal of hazardous waste between 1919 and 1949 and suggesting that the court would have granted summary judgment to the plaintiff had there not been a genuine issue of material fact with respect to damages), Murray v. Bath Iron Works, 867 F. Supp. 33, 46 (D. Me. 1994) (same, involving waste disposal starting in "the 1960s" and continuing through 1985), and Hanlin Group, Incorporated v. International Minerals & Chemical Corporation, 759 F. Supp. 925 (Recommended Decision), aff'd 759 F. Supp. 925 (D. Me. 1990) (involving hazardous waste disposal occurring between 1967 and 1982 and reasoning that the imposition of strict liability for such disposal would not be "inconsistent with the actual holding of Reynolds").  Although the

---

an easement, thereby reducing significantly the chances that the hazardous materials would be cleaned up."); Cumberland & Oxford Canal Corp., 65 Me. 140, 140-41 (1876) ("It is now perfectly well settled that one who creates a nuisance upon another's land is under a legal obligation to remove it.").

language of <u>Reynolds</u> is expansive and appears to establish that tort liability in Maine must turn on fault, it appears that the Law Court has since limited <u>Reynolds</u> to its facts, as this court first observed in <u>Hanlin</u>. <u>See</u> <u>Hayes v. Bushey</u>, 160 Me. 14, 19, 196 A.2d 823, 826 (1964) ("We neither intimate nor suggest what our holding might be in a case involving what might properly be deemed to be an extra-hazardous activity."). This certainly makes it more difficult to determine what the Law Court would do if faced with the instant question. In my view, the Restatement standard for what constitutes an abnormally dangerous activity is a much more reliable predictor of whether the Law Court would impose strict liability for the disposal of hazardous wastes. <u>See</u> Restatement (Second) of Torts § 520 & cmt. f (listing six factors for determining whether an activity is abnormally dangerous and indicating that "ordinarily several of them will be required for strict liability"); <u>see</u> <u>also</u> <u>id.</u> § 519 (setting forth the general principle). Additionally, my impression is that the Law Court would find persuasive common law precedent from other state courts. Regardless, extended discussion of these factors is not called for in this case because the statute of limitation has run on any strict liability claim. The injury-causing conduct in this case was the disposal of hazardous waste that, according to the City, ceased more than 40 years ago. Pursuant to 14 M.R.S.A. § 752, "All civil actions shall be commenced within 6 years after the cause of action accrues and not afterwards . . . except as otherwise specially provided." Unlike continuing trespass and nuisance theories, in which a claimant's injury stems from the ongoing existence of a harmful condition that could be removed, strict liability theory is premised on the abnormally dangerous nature of the defendant's <u>acts</u>, not the conditions created by those acts. Thus, the rationale of <u>Jacques</u>, in which the Law Court suspended the statute of limitation for abatable and continuing trespasses or nuisances, 676 A.2d at 508, does not logically extend to the City's strict liability claim.[20] <u>But</u> <u>see</u> <u>Lefebvre v. Central</u>

---

[20]     The City does not contest the statute of limitation argument in its discussion of the strict liability claim.

Me. Power Co., 7 F. Supp. 2d 64, 72 (D. Me. 1998) ("Because Plaintiff alleges continuing harm caused by Defendant's disposal, the court finds the Maine Law Court's analysis in Jacques persuasive in the context of Plaintiff's strict liability claim.").  Accordingly, I recommend that the court grant Citizens's motion with respect to the City's strict liability claim.[21]

## 1.   Punitive Damages

The City alleges that Citizens disposal activities were performed with actual or implied malice toward the City.  (Docket No. 175, count XVI.)  As was the case with the private nuisance issue, the City attempts to generate a factual question based on assertions that Citizens disposed of hazardous waste with knowledge of the harmfulness of its activities, but fails to incorporate any of the evidence it cites into a statement of additional material facts.  My assessment is that the discharge of tar-laden wastewater as part of the gas plant's operation between the mid-Nineteenth and the mid-Twentieth Century is not so outrageous that malice could reasonably be inferred by the factfinder, even though the industry may have been generally aware at least as of the turn of the century that its operations visited a significant nuisance upon the public.[22]  See Tuttle v. Raymond, 494 A.2d 1353 (Me. 1985).  I therefore recommend that summary judgment enter on the punitive damages count.

## 2.   Equitable Defenses

Citizens argues that it is entitled to summary judgment based on the equitable defenses of laches, unclean hands and estoppel.  (Docket No. 315 at 32-34.)  I am not persuaded that any of

---

[21]     Although I recommend that the City's strict liability claim be dismissed, the strict liability "concept" may survive in the City's public nuisance claim.  See Cox v. City of Dallas, 256 F.3d 281, 290 (5th Cir. 2001) (suggesting that "public nuisance law [as opposed to private nuisance law] tends to impose liability more often on the basis of strict liability" and citing cases).

[22]     It is not difficult to conceive of a case in which the release of hazardous waste might be so outrageous an act that malice could be inferred, but the picture that the City has thus far presented of the historical operation of the gas plant presents the sort of commonplace industrial pollution that was, until the latter half of the Twentieth Century, a generally accepted aspect of social, economic and technological progress in this country.  Although these practices reflect a certain amount of indifference toward (or perhaps calculated acceptance of) the external harms they caused, they are not, without more, indicative of ill will toward the general population.

these doctrines warrant a summary disposition. The laches argument is premised on an assertion that the City waited 20 years before commencing this action. However, even if a 20 year period were sufficient to warrant dismissal of a public nuisance claim on the basis of laches, which is questionable, the summary judgment record does not support a finding that the City sat on its heels for 20 years. What the record indicates is that the City was aware of the tar slick for 20 or more years. But to find that the City believed as early as 20 years ago that the gas plant was responsible for the tar slick would require the court to draw an inference in favor of Citizens, which is inappropriate because Citizens is the summary judgment movant. Citizens's unclean hands and estoppel arguments are best described as colorable. These arguments are based on the role the City played in conditioning the initial operation of the gas plant on the discharge of waste water into the River and the City's subsequent involvement with the related sewer installation. To be sure, these particular circumstances raise some equitable considerations. However, I am not convinced that the summary judgment record presented to the court should be construed as barring the City's public nuisance claims. In the first place, public rights are at stake in this litigation and they should not be casually extinguished. Massachusetts ex rel. Bellotti v. Russell Stover Candies, Inc., 541 F. Supp. 143, 144 (D. Mass. 1982) ("The defense of laches is no bar to a suit brought by the government to vindicate a public right."). Furthermore, it is difficult to characterize the City's acts, given their Nineteenth Century context, as misrepresentations or bad acts. See Town of Freeport v. Ring, 1999 ME 48, ¶ 14, 727 A.2d 901, 906 (holding that equitable estoppel depends on misrepresentations that induce detrimental reliance); Hamm v. Hamm, 584 A.2d 59, 61 (Me. 1990) (holding that one with unclean hands is one who "has violated conscience or good faith"). Nor is it clear that Citizens or its predecessors detrimentally relied on the City's acts. The City's actions did nothing to prevent Citizens and its

predecessors from conducting the gas plant's discharge operations in a less intensive manner so as not to produce such a substantial tar slick.  Indeed, Citizens maintains that the gas plant's operations did not contribute to the tar slick at all.  In other words, although the City facilitated the discharge of hazardous waste sufficiently to be a PRP under CERCLA § 107, Citizens was not thereby relieved of its obligation to exercise its operations in fashion that would not give rise to a public nuisance.

### 5. A Caveat Regarding State Common Law and Statutory Relief

The final issue raised by Citizens concerns whether it is appropriate to permit the City to seek an injunction under Maine law to force Citizens to clean up a property (the River) that is owned by the State.  (Docket No. 315 at 35.)  Citizens views as problematic the fact that "it would have to trespass on State-owned parts of the riverbed" in order to conduct any cleanup.  (Id.)  In light of this concern, Citizens maintains that "[e]quity will . . . not permit the City to proceed with any injunctive claims."  (Id.)  None of the authorities cited by Citizens supports the proposition it is advancing.[23]  At this stage of the litigation, it strikes me as premature to be trying to foreclose remedies when liability has not even been established.  Moreover, the City's RCRA claim could make this argument irrelevant insofar as it might independently support injunctive relief.  Finally, in the event that liability is established, it is conceivable that the Maine DEP might be heard in the context of a hearing on the appropriateness of any injunctive remedy.  Indeed, the record suggests that the DEP would probably like to see a cleanup order issue from this litigation.

Counsel for third-party defendants UGI Utilities and Centerpoint Energy Resources were present at the hearing on the pending summary judgment motions but did not present argument

---

[23]     Citizens citation of American Jurisprudence (Second) suggests that this argument is related to the standing argument that arises when private parties seek injunctive relief in connection with public nuisances.  See 42 Am. Jur. 2d Injunctions § 17.

with respect to the motions. However, at the conclusion of the hearing counsel for UGI expressed concern whether the court envisioned that litigation between Citizens and the City would be binding against third-party defendants, who were essentially sidelined from this litigation in connection with the prior entry of judgment against Citizens's third-party CERCLA action against the Army Corps of Engineers and my order, entered by consent, staying discovery of third party experts. In light of the current recommendation, Citizens's third party complaints might be viewed as continuing to have some viability under the counts for common law contribution, indemnification and negligence, although those issues have never been briefed. I would recommend at this juncture that the court bifurcate this case and proceed solely on the action between the City and Citizens. This course of action seems particularly appropriate in this case, where the City adamantly maintains that Citizens is the sole responsible party. Any findings that the court might make concerning third-party responsibility for response costs would be ancillary to its determination of Citizens's equitable share of response costs and would not be binding against a third-party. If, under some statutory or common law theory, the court imposed upon Citizens's liability for more than its equitable share of the clean up cost, (or if an appellate court determined that the City was not a PRP and that this action should have proceeded as a pure § 107 action) the third party actions might be reborn. In the absence of such a contingency, it makes little economic sense to proceed with the third parties still in the case and I would recommend that those third party complaints be stayed without prejudice to either Citizens or the third parties and the case between Citizens and the City proceed to trial on the issue of liability and Citizens's equitable share of the response costs under CERCLA.

**Conclusion**

For the reasons set forth above, I **RECOMMEND** that the court **GRANT** Citizens's

Motion for Summary Judgment (Docket No. 315) **IN PART**, by entering judgment in favor of

Citizens on counts IX and XII (private nuisance claims), XIII (strict liability/ultra-hazardous

activity), and XVI (punitive damages) of the City's Second Amended Complaint (Docket No.

175).

**<u>NOTICE</u>**

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within ten (10) days of being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection. Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/Margaret J. Kravchuk
U.S. Magistrate Judge

Dated July 6, 2004