## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| **CITY OF BANGOR,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil No. 02-183-B-S** |
| | ) | |
| **CITIZEN COMMUNICATIONS** | ) | |
| **COMPANY,** | ) | |
| | ) | |
| **Defendant & Third** | ) | |
| **Party Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **BARRETT PAVING MATERIALS, INC. et al.,** | ) | |
| | ) | |
| **Third Party Defendants.** | ) | |

## ORDER GRANTING MOTION TO INTERVENE AND MOTION FOR ENTRY OF CONSENT DECREE

Before the Court are eight separate but related motions.  The pending motions include the recently filed (1) Motion to Intervene (Docket # 716) by the State of Maine and the Maine Department of Environmental Protection (together, the "State"), (2) Joint Motion for Entry of Consent Decree (Docket # 715) by Plaintiff City of Bangor ("City") and Defendant Citizens Communications Company ("Citizens"), and (3) Citizens' Motion for Leave to File Supplemental Third Party Complaints (Docket # 717).  In addition, the Court has previously taken under advisement multiple motions for judgment by third and fourth party defendants.  These motions include: (1) Motion for Judgment by Third-Party Defendants Barrett Paving Materials, Inc. and Honeywell, Inc. and Fourth-Party Defendant Colas, S.A. (Docket # 682), (2) Third-Party Defendants Maine Central Railroad Company and Guilford Transportation Industries, Inc.'s Motion to Dismiss

and/or Judgment on the Pleadings (Docket # 703), (3) Third-Party Defendant Dead River Company's Motion for Judgment on the Pleadings (Docket # 704)[1] and (4) Motion for Judgment on the Pleadings by Third-Party Defendant Beazer East, Inc. (Docket # 705) (all four motions together, the "Non-MGP Parties' Motions for Judgment"). Finally, there is the Request for Oral Argument (Docket # 734) through which Barrett Paving Materials, Inc., Honeywell, Inc. and Fourth-Party Defendant Colas, S.A. jointly seek to have oral argument on all of the motions now before the Court.

As explained herein, the Court now GRANTS the Motion to Intervene (Docket # 716) and the Motion for Entry of the Consent Decree (Docket # 715) finding that no oral argument is necessary. The Court RESERVES RULING on the remaining motions, including the Non-MGP Parties' Motions for Judgment (Docket #s 682, 703, 704 & 705) as well as Citizens' Motion for Leave to File Supplemental Third Party Complaints (Docket # 717). As detailed below, the Court requests further briefing from the parties on these motions in order to allow all sides ample opportunity to brief the impact of the Consent Decree on any and all claims that Citizens seeks to pursue following entry of the Consent Decree.

To the extent that the Non-MGP Parties' Request for Oral Argument (Docket # 734) sought oral argument on the Motion to Intervene and the Motion for Entry of the Consent Decree, the Request is hereby DENIED IN PART in accordance with Local Rule 7(f). However, the Court will separately consider whether to hold oral argument on the remaining pending motions after it has received the supplemental briefing on those motions.

---

[1] See Third Pty Defs. Maine Central Railroad Co. & Guilford Transportation Indust., Inc. Reply (Docket # 710) at 2 (clarifying the title of the original motion).

## I.      MOTION TO INTERVENE

Via the pending Motion to Intervene, the State seeks to become a party to this action approximately four and a half years after the City filed its initial complaint.  The Motion to Intervene invokes both Federal Rule of Civil Procedure 24(a), which allows for intervention as a right, and, alternatively, Federal Rule of Civil Procedure 24(b).  In light of the fact that the State now seeks to intervene solely to participate in the simultaneously proffered consent decree, it is not surprising that neither the City nor Citizens object to the State's intervention request.  However, various third and fourth party defendants (hereinafter, the "Third Parties") have filed objections to the State's Motion.  These objections focus on the alleged timeliness of the Motion and the State's failure to comply with Rule 24(c) by filing a pleading.  The Court addresses these two objections below.

## A.      Standard of Review

Generally, upon a showing that (1) its application is timely, (2) it has an interest relating to the property or transaction that is the subject of the action, (3) it is so situated that the disposition of the action may as a practical matter impair or impede its ability to protect that interest, and (4) its interest will not be adequately represented by existing parties, a proposed intervenor shall have a right to intervene pursuant to Rule 24(a).  See Travelers Indem. Co. v. Dingwell, 884 F.2d 629, 637 (1st Cir. 1989).  The First Circuit has described timeliness as "a sentinel at the gates" but also noted that timeliness is determined by "examining the totality of the relevant circumstances," rather than via application of a "bright-line rule."  Banco Popular de Puerto Rico v. Greenblatt, 964 F.2d 1227, 1230 (1st Cir. 1992).  Nonetheless, the First Circuit has adopted four factors to be considered in determining the timeliness of a motion to intervene; these factors include:

"(1) the length of time the applicant knew or reasonably should have known that its interest was imperilled before it moved to intervene; (2) the foreseeable prejudice to existing parties if intervention is granted; (3) the foreseeable prejudice to the applicant if intervention is denied; and (4) idiocratic circumstances which, fairly viewed, militate for or against intervention." Id. at 1231.

With respect to Rule 24's pleading requirement, the rule clearly states that a motion to intervene "shall be accompanied by a pleading setting forth the claim . . . for which intervention is sought." Fed. R. Civ. P. 24(c).  Given this clear language, a proposed intervenor who does not file a pleading does so at his peril.  Nonetheless, the Court's ultimate decision on intervention must be driven by the merits of the motion, especially when the record otherwise makes clear exactly what claims or defenses the proposed intervenor seeks to pursue or otherwise resolve.  See, e.g., Beckman Indus., Inc. v. International Ins. Co., 966 F.2d 470, 474-75 (9th Cir. 1992), cert. denied, 506 U.S. 868 (1992) (explaining that the absence of an actual pleading may not be fatal when "the movant describes the basis for intervention with sufficient specificity to allow the district court to rule"); United States ex rel. Frank M. Sheesley Co. v. St. Paul Fire & Marine Ins. Co., 239 F.R.D. 404, 408-12 (W.D. Pa. 2006).  In short, under certain rare circumstances, a court, in an exercise of its discretion, might allow intervention although the intervening party did not technically comply with the pleading requirement.

**B.      Discussion**

The Court's analysis of the State's request for intervention begins by simply acknowledging those factors that the State clearly satisfies.  Specifically, there is no dispute that the State has an interest in the property that is the subject of the action and

that the disposition of this action will, as a practical matter, impact the State's ability to protect that property interest.  In fact, this Court previously found that the State owns the submerged portions of Dunnett's Cove, which make up a significant portion of the contaminated area at issue, and also concluded that the Court could order the City and Citizens to take actions to clean up this State-owned property.  (See June 27, 2006 Findings of Fact & Conclusions of Law (Docket # 658) at 30 & 67.)  Moreover, in light of these findings and the rest of Court's Phase One Findings of Fact and Conclusions of Law, it is clear that the State's interest as a property owner will not be adequately represented by the existing parties.

Thus, the only remaining issue with respect to the merits of the State's Motion to Intervene is timeliness.  The Court certainly understands the concerns expressed in the objections of the Third Parties regarding the belated nature of the State's request. Undoubtedly, the State could have moved to intervene in this action much sooner.  As the Third Parties point out, this Court actually invited the State to intervene in 2003.  (See Aug. 6, 2003 Order (Docket # 116) at 4.)  This invitation followed the State's own acknowledgment that it had "two analytically distinct but related interests in [this] litigation;" namely, its ownership interest in the affected submerged portions of the Cove and its overlapping state regulatory authority pursuant to the Maine Uncontrolled Hazardous Substances Sites Act, 38 M.R.S.A. §§ 1361 et seq. (May 22, 2003 Letter (Docket # 32).)  Given these acknowledged interests, it is puzzling to the Court that the State decided to wait approximately four years to intervene.

Nonetheless, the Court's timeliness inquiry is ultimately governed by the First Circuit's four factors for timeliness.  In considering the length of time that the State

should have reasonably known its interest was imperilled, the Court must acknowledge the State's interests became significantly more imperilled (and inadequately represented by the existing parties) following the June 2006 Findings of Fact and Conclusions of Law.  Prior to this published decision, the State believed (albeit mistakenly) that its interests were adequately represented by the City.[2]  Following the Court's decision, the State now acknowledges that its "interest cannot be adequately represented by either the City or Citizens because both these parties are obligated to pay for the remedial actions and therefore have a potential conflict of interest regarding the selection of these remedies."  (State's Mot. to Intervene (Docket # 716) at 4.)  It is clear that the State has recognized this conflict since the publication of the Court's Phase One decision and promptly became actively involved in working with the parties to determine the course of the action and the ultimate remediation of the Dunnett's Cove site.  (See, e.g., Aug. 29, 2006 Report of Conference & Order (Docket # 671) & Ex. 1.)  In short, the Court believes that the State has acted expeditiously since learning how its interests were imperilled by the Court's June 27, 2006 decision.  While it is likely that the State could have intervened as a right prior to June 27, 2006, the Court believes that the State's failure to intervene prior to the conclusion of the Phase One proceeding is excusable.

As the above discussion makes clear, there is undoubtedly foreseeable prejudice to the State if intervention is denied and the idiocratic circumstances of this complex, trifurcated case weigh in favor of allowing intervention.  In fact, the Court remains concerned and perplexed by the possibility that the various statutory schemes currently

---

[2] Perhaps the best support for this conclusion is found in the evidence that the State agreed to partially fund the investigation undertaken by the City's retained experts in connection with this case.  See June 27, 2006 Findings of Fact & Conclusions of Law (Docket # 658) ¶¶ 138 & 139.

being brought to bear on the Dunnett's Cove site (i.e., RCRA, CERCLA and Maine's Uncontrolled Hazardous Substance Sites Act) may result in different remediation orders being issued to the same parties with little guidance as to how these differing remediation schemes would be reconciled.[3]  In short, allowing the State to intervene, especially for the purposes of pursuing a consent decree that will result in a single consolidated remediation of the site, best serves all interested parties and ensures that this litigation is not rendered superfluous by State actions that might otherwise come at a later date.

With respect to the foreseeable prejudice to the existing parties if intervention is granted, the Court believes that there is no such prejudice.  Rather, the State's representation that it "will take no action in this case against any of the third or fourth parties" suggests that its intervention will either have no impact on the Third Parties or may serve to consolidate and simplify any attempts to hold any third or fourth party liable for remediation of the site.  Thus, although it may on its face appear antithetical, the Court concludes, after having considered all of the relevant factors, that the State's request for intervention in this 2002 case is timely.

The only remaining issue is the apparent procedural defect in the State's Motion, namely, its failure to file a pleading.  The Court believes that the other submissions made in connection with the pending motions adequately describe the State's basis for intervention.  Specifically, the proposed consent decree details that the State agrees that the Consent Decree "represent[s] full satisfaction of the [State's] claims with respect to the Site." (Consent Decree (Docket # 715-2) ¶6.A.)  The Consent Decree then goes on to

---

[3] See State Reply (Docket # 730) at 3 n. 2 (explaining that "while the State does have legal authority to proceed independently of the current action, the State's ability to do so as a practical matter is impaired if it is not allowed to intervene").

list in detail the various claims that the State is releasing (i.e., "38 M.R.S.A. §§ 1304(12), 1318-A, 1319-J, 1361 or 1371, sections 106 or 107 of CERCLA, 42 U.S.C. §§ 9606, 9607, §§ 7002 or 7003 of RCRA, 42 U.S.C. §§ 6972, 6973").[4]  (Consent Decree ¶¶ 6.B & 7.)  In addition, the State's submissions in connection with the Motion to Intervene offer further explicit assurances that "the only type of complaint that the State would file is a complaint against Citizens and the City restating the same claims identified in the Consent Decree" and that "the State agrees not to proceed against any third or fourth party following entry of the Consent Decree." (State Reply (Docket # 730) at 3-4.)

Given these representations, requiring the State to file a complaint that simply restated the claims it has agreed to release via the Consent Decree would be a procedural exercise that would serve only to clutter the docket in this complex case.  The State has made clear that it would not actually pursue such a complaint and that its request for intervention is solely limited to its desire to pursue entry of a consent decree.  (See State Reply at 2 ("[S]hould the Court deny the motion for entry of the Consent Decree then the State would ask that the Court also deny the motion to intervene because the State would in that event address remediation of the Dunnett's Cove site using its statutory authorities.").)  Under these unique circumstances, the Court believes it is a proper exercise of its discretion to excuse the State's failure to file a pleading and rely on the presented record in considering the merits of the claims that serve as the basis for the State's request to intervene.  Having considered the merits, the Court GRANTS the Motion finding that the State satisfies the requirements for intervention as a right.

---

[4] Lest the Court oversimplify the nature of the State's releases, the Court also notes that the releases for Citizens and the City also include separate catch-all provisions but, with respect to the City, the Consent Decree includes a reservation of rights for "Natural Resource Damage."  See Consent Decree ¶¶ 6.B, 7 & 8.A.

## II.        JOINT MOTION FOR ENTRY OF CONSENT DECREE

The Court next turns its attention to the Joint Motion for Entry of the Consent Decree (Docket # 715).   The Court has considered the merits of this Motion in conjunction with the State's request for intervention given the tandem nature of the motions.   Thus, it is not surprising that the Court is also GRANTING the Motion for Entry of the Consent Decree.   In the discussion below, the Court endeavors to explain the basis for this ruling.

As proposed, the Consent Decree will resolve all claims between and among the City, Citizens and the State.   Under the terms of the Consent Decree and a related underlying settlement agreement, Citizens has agreed to pay $7.625 million into an escrow fund that will, in turn, fund the remediation of the Dunnett's Cove site.[5] However, rather than simply "cash out" in exchange for this payment, Citizens also has agreed to continue to pursue other third parties, which it continues to believe are responsible for contributing the contamination in the Cove.   To that end, the Settlement Agreement assigns to Citizens any claims that the City might have against Third Parties related to the Site.   The City, for its part, has agreed to be responsible for the actual remediation of the Site, which will require it to work closely with the State to finalize and

---

[5] This amount reflects the upper limit of what Citizens may ultimately pay towards the remediation.  Under a somewhat complex formula detailed in the Settlement Agreement, there are various methods in which Citizens might ultimately pay less than $7.625 million.   Namely, under the terms of the Settlement Agreement, Citizens is entitled to receive a refund from the escrow fund equal to two-thirds of the cost of any remediation work that is completed with a federal appropriation. See Settlement Agreement (Ex. B to Docket # 732) at 4.  In addition, Citizens is entitled to keep the bulk of any amounts paid as a result of its pursuit of claims against Third Parties.   See id. at 3-4.  The enforceability of these provisions is not a question currently before the Court.  The Court, therefore, expresses no opinion as to whether these provisions are enforceable or the likelihood that either provision will result in Citizens ultimately contributing less than $7.625 million toward the remediation of the Cove.  Rather, the Court's assessment of the Consent Decree proceeds on the basis that Citizens has agreed to pay up to $ 7.625 million toward the remediation in addition to the possibility that Citizens may secure additional funds via further litigation as expressly allowed under 42 U.S.C. § 9613(f)(3).

implement a remediation plan.   Under the terms of the Consent Decree, the City is financially responsible for the cost of remediation to the extent it exceeds the balance of the escrow fund.

The proposed Consent Decree follows an extended stay, which this Court allowed after issuing its detailed Phase One Findings of Fact and Conclusions of Law on June 27, 2006.  During that stay, Citizens and the City resumed conversations with the State that had began prior to the Phase One trial.  The Court required the filing of frequent status reports during this stay, which served to update not only the Court but all interested parties as to the status of any settlement negotiations. (See, e.g., Report of Conference (Docket # 671), Joint Status Report (Docket # 674), Joint Status Report (Docket # 677), Joint Status Report (Docket # 679), Joint Status Report (Docket # 684), Order & Report of Phase Two Status Conference (Docket # 690), Joint Status Report (Docket # 693).) Ultimately, the City and Citizens entered into a settlement agreement, dated February 16, 2007, and then jointly finalized a consent decree with the State that built upon that settlement agreement.  (See Settlement Agreement (Docket # 732-3); Consent Decree (Docket # 715-2).)[6]

Prior to there being any finalized Consent Decree, the Court lifted the stay on February 28, 2007 in order to allow third parties to pursue various motions for judgment. (See Order & Report of Conference (Docket # 701).)   The Court received the Joint

---

[6] In assessing the Consent Decree, some third and fourth parties urge the Court to give equal consideration to the Settlement Agreement, which they assert may, in fact, trump the Consent Decree.  See Obj. to Consent Decree (Docket # 732) at 10-12.  The Court is grateful to the parties for supplying the Court with a copy of the Agreement and has certainly reviewed the terms of the Settlement Agreement to the extent that they impact the Consent Decree.  However, in light of Citizens' own clear representations to the Court that: (1) the Consent Decree is "fully acceptable" to Citizens and (2) although the Settlement Agreement may, in fact, be contingent on this Court's approval of the Consent Decree, the Consent Decree, once approved by the Court, is in no way contingent on the Settlement Agreement, City & Citizens Reply (Docket # 744) at 6., the Court is satisfied that the Settlement Agreement in no way "trumps" the terms of the Consent Decree.  Based on this conclusion, the Court believes it is proper to limit its review to the Consent Decree.

Motion for Entry of the Consent Decree on April 11, 2007 while the Motions for Judgment remained under advisement.[7] Upon review, the Court determined that it was appropriate to take up the issue of whether it would approve the Consent Decree prior to taking any action on the third party claims. In accordance with that determination, the Court turns its attention to the proposed Consent Decree.

**A.      Standard of Review**

As it relates to the pending matter, the proposed Consent Decree would resolve overlapping CERCLA and RCRA claims related to the Dunnett's Cove site. All parties that have made submissions in connection with the Joint Motion for Entry of Consent Decree have directed the Court's attention to various cases laying out a standard of review for CERCLA consent decrees. See, e.g., United States v. Davis, 261 F.3d 1, 19-29 (1st Cir. 2001); United States v. Charter Int'l Oil Co., 83 F.3d 510, 514-23 (1st Cir. 1996); United States v. Charles George Trucking, Inc., 34 F.3d 1081, 1084-89 (1st Cir, 1994); United States v. Cannons Engineering Corp., 899 F.2d 79, 85-94 (1st Cir. 1990). The Court has neither received nor found any authority indicating that a different standard of review should be utilized for RCRA consent decrees.[8] Thus, the Court herein applies the CERCLA standards to its review of the Consent Decree noting any specific RCRA-related concerns only where applicable and where those concerns are substantially

---

[7] On May 15, 2007, the Court received from the State copies of all public comments it received to the Consent Decree during a thirty-day public comment period. See Docket # 751. Not surprisingly, the two sets of public comments actually came from entities that are third and fourth parties in the current action. The Court has reviewed these comments but determined that they do not require any discussion in the context of the pending Motion. Moreover, it is unclear whether there is any basis for the Court to consider arguments presented via a voluntary public comment period, especially when those same arguments are not included in the parties' submissions to this Court. See Docket # 722.

[8] As the Court explained in its earlier Phase One decision, RCRA liability was limited to a relatively small section of the entire Site, while CERCLA liability appeared to apply to the entire Site. See Findings of Fact & Conclusions of Law at 56-58, 68-70, 80.

different from CERCLA.

In order to approve a CERCLA consent decree, the Court must find that the proposed decree is fair, reasonable and consistent with the purpose of the statute.  See Cannons, 899 F.2d at 85.  The Court's review must acknowledge "the wide range of potential problems and possible solutions" and thereby leave it to the parties to resolve "highly technical issues and relatively petty inequities." Id. at 85-86.  "The relevant standard, after all, is not whether the settlement is one which the court itself might have fashioned, or considers as ideal, but whether the proposed decree is fair, reasonable, and faithful to the objectives of the governing statute."  See id. at 84 (citing Durrett v. Housing Authority, 896 F.2d 600, 603-04 (1st Cir.1990)).

**B.     Discussion**

**1.     Fairness**

In assessing the fairness of a consent decree, the First Circuit has said there are two distinct components: procedural fairness and substantive fairness.  See Cannons, 899 F.2d at 86.  "To measure procedural fairness, a court should ordinarily look to the negotiation process and attempt to gauge its candor, openness, and bargaining balance." Id. (citations omitted).  The Court has attempted to strike a delicate balance in this matter to ensure that its knowledge of and involvement in settlement negotiations does not provide a basis for recusal before the matter is finally concluded. (See Order Setting Phase Two Status Conference (Docket # 685).)  Nonetheless, the Court is familiar with the ongoing negotiations that took place over many months between the State and experienced counsel for both Citizens and the City.  To the extent that some of those early discussions took place prior to the Phase One trial, there was also evidence and

argument presented during the course of the Phase One trial related to discussions with Maine DEP, including Citizens and the City's joint retention of BBL to present remedial options to Maine DEP.  Based on the information available to the Court, as between the State, the City and Citizens, the Court is amply satisfied that the Consent Decree represents the end result of a procedurally fair, arm's-length negotiation process.

The objections of the various third and fourth parties urge the Court to find the Consent Decree procedurally unfair based on the suggestion that the third and fourth parties were excluded from participating in the negotiations that led to the Consent Decree.  Notably, although the objectors lace these arguments into their memoranda, the record is devoid of any evidence, including any affidavits of counsel, suggesting that any third or fourth party asked to attend or participate in settlement talks that culminated in the Consent Decree but were affirmatively excluded.  Rather, the memoranda suggest simply that they were never affirmatively invited.  (See, e.g., Centerpoint & UGI Response (Docket # 731) at 2.)  Despite the lack of an invitation, the status reports undoubtedly put the third and fourth parties on notice that settlement discussions were ongoing.  Given that notice, these parties could have certainly requested the opportunity to participate.  Absent some affirmative attempts to participate in the negotiations, the third and fourth parties cannot now complain that they were unfairly excluded based simply on the lack of an unsolicited invitation.  Thus, the Court finds the "unfairly excluded" objection to the consent decree lacks factual support.

Moreover, the Court notes that the State was certainly free to adopt a "divide and conquer" approach to settlement of this complex matter.  In fact, given the liability findings made by this Court with respect to Citizens and the City, it was fair and

reasonable for all sides to recognize that these two parties were differently situated with respect to settlement compared to the third and fourth parties, who were still subject to a discovery stay.  See, e.g., Cannons, 899 F.3d at 86 (explaining that the agency was free to establish categories of PRPs).  Although a global resolution might have been possible and even preferable, it is not surprising or unfair that the City and Citizens would reach a settlement without the participation of the third or fourth parties given the trifurcated nature of the proceedings.[9]

In short, the Court finds the Consent Decree to be the product of a procedurally fair process; this finding, in turn, informs the Court's assessment of the Consent Decree's substantive fairness.  See Charles George Trucking, Inc., 34 F.3d at 1089.  However, the substantive fairness inquiry is intended to focus on the "concepts of corrective justice and accountability."  Id. at 1088.  While the First Circuit has endorsed the trial court conducting this assessment by "compare[ing] the proportion of total projected costs to be paid by the settlers with the proportion of liability attributable to them," they have also recognized that allocations of this sort may be difficult if not impossible on a "muddled" or undeveloped record.  Id. at 1088-89.

In this case, there remains uncertainty as to the total projected cost of the Dunnett's Cove remediation and no party has offered an estimate of total projected cost in connection with the Motion for Entry of the Consent Decree.  Nonetheless, this unknown does not prohibit the Court from finding that the Consent Decree is

---

[9] Some third parties also urge the Court to question the procedural fairness of the Consent Decree given the State's role in the negotiations; specifically, questioning the manner in which the State has hired Dennis Harnish, a recently retired Assistant Attorney General, to work on the Consent Decree.  The Court is satisfied that the State's explanation of Mr. Harnish's continuing involvement is imminently reasonable and, in fact, evidences that the State was served by experienced counsel in finalizing the Consent Decree. See State Reply (Docket # 743) at 1-2; Aff. of Henry Aho (Docket # 743-3).

substantively fair.  The First Circuit previously has endorsed the trial court "confin[ing] its inquiry to the substantive fairness of the aggregate class contribution" without concerning itself as to how the members of the settling class have chosen to divvy up the various costs and risks.  Id.; see also Davis, 261 F.3d at 25.  Pursuant to the Consent Decree, the City and Citizens have agreed to fund the entire remediation regardless of whether contribution is ever received from other parties or sources.  Thus, to the extent the cost of the remediation remains unknown, these settling PRPs (the City and Citizens) have agreed to bear the risk of this unknown.[10]  More specifically, since Citizens has locked in a maximum payment of $7.625 million towards the remediation, the City ultimately has agreed to accept responsibility for the cost of remediation to the extent it exceeds $7.625 million and no other contributions are ultimately secured from other sources.[11]  Quite simply, on the record currently available, there is no basis for finding this allocation to be substantively unfair.

---

[10] The Court finds no merit to the argument that substantive fairness required the State to contribute to the remediation as a PRP when there are no claims pending against the State and no party involved in this case has the ability to press such a claim against the State.  See Centerpoint & UGI Response at 3 n. 1. Similarly, arguments that the consent decree is unfair because it orders reimbursement to the State that may be inconsistent with the trial findings are meritless; such arguments ignore the fact that while the Court had before it only claims under CERCLA and RCRA, the Consent Decree resolves additional state law claims. See Charles George Trucking, 34 F.3d at 1090 (explaining that consent decrees may resolve additional unasserted claims that are within the general scope of the pleadings).

[11] As noted above, no party has attempted to provide the Court with a projection of the total remediation cost.  (This is due, in large part, to the fact that the actual remedy to be implemented remains to be decided.)  Nonetheless, via the record put before the Court during the Phase One proceedings, the Court is able to take judicial notice of the fact that remedies previously found acceptable by Maine DEP had an estimated total cost in the range of $13.2 million to $21.9 million, which includes an Active Zone remedy with a total cost of $12.4 million to $20.4 million.  (See Phase One Trial Exs. 346 & 347.)  These total cost estimates clearly represent the upper limit of the remediation that is likely to occur pursuant to the Consent Decree and there is a possibility that the total remediation cost may be significantly less than these estimates.  Viewed against these projections, Citizens' contribution of $7.625 million roughly correlates to the Court's previous equitable apportionment, especially when one considers the additional response costs Citizens has already incurred. See Findings of Fact & Conclusions of Law ¶151 (finding that Citizens had incurred documented costs of $1,331,185.36 in connection with its investigation of the Site).\

2.      **Reasonableness**

While describing the evaluation of a consent decree's reasonableness as "a multifaceted exercise," the First Circuit has explicitly called upon the Court to look at the following factors: (1) the "technical adequacy" or "efficaciousness [of the decree] as a vehicle for cleansing the environment;" (2) "whether the settlement satisfactorily compensates the public for the actual (and anticipated) costs of remedial and response measures;" and (3) "the relative strength of the parties' litigation positions."   Cannons, 899 F.2d at 89-90.

The Consent Decree now before the Court contemplates a remedy for the Dunnett's Cove site that would at least match (and may well exceed) the remedy that would have resulted from this case being tried through a remedial phase.  Thus, the Consent Decree undoubtedly compensates the public at large.  Moreover, by allowing for the remedial process to begin without awaiting the completion of further litigation (including potential lengthy appeals), the Consent Decree is an efficient vehicle for cleaning the Site.

Some third parties object to the reasonableness of the remedy that may be implemented under the Consent Decree because that remedy may exceed what the Court would have required pursuant to its findings of CERCLA and RCRA liability.  Quite simply, nothing prevents the City and Citizens from agreeing to do more remediation than might be required by CERCLA and RCRA.  In fact, given that the Consent Decree also resolves claims that might be brought under the Maine's Uncontrolled Hazardous Substance Sites Act, 38 M.R.S.A. § 1361 et seq., it is not surprising that the Consent Decree contemplates more extensive remediation than what might have resulted from a

Phase Two trial.  To the extent that any portion of the remedy exceeds the requirements of CERCLA and the National Contingency Plan, this is simply not a basis for disapproving the Consent Decree.  Rather, this is simply an argument that any third party would be entitled to press if and when Citizens sought CERCLA contribution for a remedial measure that exceeded this standard.  (See Findings of Fact & Conclusions of Law at 80.)

With respect to the third reasonableness factor — the litigation positions of the parties, the Court simply refers to its previous Findings of Fact and Conclusions of Law in which the Court discussed the post-Aviall CERCLA liability issues while noting the relative strength of the RCRA liability finding.  (See Findings of Fact & Conclusions of Law at 74-79.)  Under these circumstances, there was undoubtedly a good faith basis for continuing this litigation between Citizens and the City.  However, both sides reasonably realized that continued litigation on the remedy question would be "a cost-ineffective alternative which [would] squander valuable resources, public as well as private," especially when an arguably broader state remedial scheme remained as an alternative enforcement mechanism.  Cannons, 899 F.2d at 90.

The Court is amply satisfied that the Consent Decree represents a reasonable resolution of this matter.

**3.      Fidelity to CERCLA & RCRA**

Finally, the Court is instructed to consider whether the proposed Consent Decree meets the goals of CERCLA and RCRA.  This inquiry clearly overlaps with the Court's assessment of reasonableness.  "The purposes of CERCLA include expeditious remediation of waste sites, adequate compensation to the public fisc and the imposition of

accountability." <u>Davis</u>, 261 F.3d at 26.  By comparison and as relevant to the pending case, RCRA's purpose is more focused on the simple goal of "ensur[ing] the proper treatment, storage, and disposal of [hazardous] waste . . . , 'so as to minimize the present and future threat to human health and the environment.'" <u>Meghrig v. KFC Western, Inc.</u>, 516 U.S. 479, 483 (1996) (quoting 42 U.S.C. § 6902(b)).  Quite simply and at the risk of repeating statements already made in connection with the Court's reasonableness inquiry, the Consent Decree clearly effectively addresses all of these statutory goals.  While a Phase Two trial also could have ultimately crafted a remedy that would have achieved these same goals, there is no doubt that such a trial would have ultimately delayed remediation.  Such a delay clearly would not serve the goals of CERCLA or RCRA.

Thus, having considered the various objections to the Consent Decree, the Court ultimately concludes that the Consent Decree is fair, reasonable and consistent with the purposes of CERCLA and RCRA.

## III.   THE REMAINING "PHASE THREE" ISSUE:   CITIZENS' CLAIMS AGAINST THIRD PARTIES

Remaining before the Court are the Non-MGP Parties' Motion for Judgment, which pre-date the Consent Decree and the State's intervention.  These Motions sought to substantially curtail any Phase Three proceedings arguing in large part that the Court's Phase One decision made Citizens' previously asserted claims meritless.  Following entry of the Consent Decree, these arguments rest on a questionable premise and beg the question: to what extent, if at all, can the Court rely on its Phase One Findings of Fact and Conclusions of Law to make any decision regarding the viability of Citizens' outstanding claims against the Third Parties?  Put a slightly different way, can the Phase One Findings of Fact and Conclusions of Law still be considered "law of the case" for

any purpose following the entry of the Consent Decree or does the entry of the Consent Decree wipe this slate clean?  Assuming the Consent Decree preempts application of law of the case, are the pending Motions for Judgment simply moot?  These are important questions, which the Court believes all interested parties should have an opportunity to brief prior to any Court ruling on the remaining motions for judgment.

There is also Citizens' Motion for Leave to File Supplemental Third Party Complaints (Docket # 717).  Citizens asserts that its supplemental claims, which arise out of the Consent Decree, undoubtedly moot any attempts by the Non-MGP Parties to have the cases against them dismissed.  Thus, Citizens urges the Court to grant their Motion to Supplement and deny all of the pending Motions for Judgment.  It is true that Citizens' contribution claims now grow out of the Consent Decree and the judgment to be entered that will implement the Decree.  Thus, the Court is hard pressed to see how Citizens is able to pursue its previous CERCLA claim under 42 U.S.C. § 9613(f)(1) and additionally pursue a "new," "supplemental" CERCLA claim under 42 U.S.C. § 9613(f)(3)(B), which is how the claims are asserted in the proposed supplemental third party complaints.  Rather, it seems that Citizens now has a single CERCLA claim for contribution that is primarily governed by 42 U.S.C. § 9613(f)(3)(B).[12]

The Court believes that such a new claim would be best pursued as an entirely new case.  Thus, the Court's initial inclination is to deny the Motion to File Supplemental Complaints without prejudice in order to allow Citizens to file what it has titled "supplemental complaints" as a new civil case.  Absent a compelling objection, the Court

---

[12] The Court notes that Citizens' third party supplemental pleadings also assert various common law claims as well as the City's newly assigned CERCLA contribution claim.  These claims are obviously also impacted by the Consent Decree and the Court will ultimately address that impact when it rules on the pending motions.

would similarly dismiss without prejudice the existing third and fourth party complaints so that Citizens could consolidate all of the claims it has related to the Dunnett's Cove site following the entry of the Consent Decree in a new action.  The Court's interest in seeing these claims proceed as a separate case is driven primarily by pragmatic, docket management concerns.  Following the Court's approval of the Consent Decree, it would seem that the already lengthy docket on this matter should remain open solely to deal with issues surrounding the implementation and enforcement of the Consent Decree.  To the extent that Citizens' supplemental complaints seek only money damages and will clearly require extensive motion practice, including in all likelihood a new round of motions to dismiss, as well as discovery, it would seem that these matters should occupy their own separate docket.

Because the Court is concerned about any unintended consequences and/or prejudice that might result from requiring Citizens to file its contribution claims as a new action, the Court wants to provide all sides with an opportunity to consider this course of action and inform the Court of any objections they may have.  To that end, the Court will accept supplemental briefs from any party wishing to address this proposal or otherwise supplement their previous arguments in light of the Court's decision to grant the Motion to Intervene and approve the Consent Decree.  All supplemental briefs shall be filed before the close of business on June 18, 2007 and shall not exceed 12 pages in length.  To the extent that any party feels compelled to respond to arguments made in a supplemental brief, a response not to exceed 6 pages may be filed before the close of business on June 25, 2007.  No reply briefs will be allowed.  After the Court has received all submissions, the Court will make a determination as to whether it will hold any oral argument or a

conference of counsel prior to ruling on the remaining pending motions.

## IV.     CONCLUSION

In accordance with the above rulings, the State is hereby GRANTED the right to intervene in this action as a plaintiff.   In addition, the Joint Motion for Entry of the Consent Decree is hereby GRANTED.   The Consent Decree is hereby APPROVED and the Clerk is directed to enter the Consent Decree as final judgment on all claims between the City, Citizens and the State in accordance with Federal Rule of Civil Procedure 54(b) and the Court's finding that there is no just reason for delay.

**SO ORDERED.**

/s/ George Z. Singal
U.S. Chief District Judge

Dated the 25th day of May 2007.